Ellis SIMON et al., Plaintiffs

v.

PHILIP MORRIS, INC.
et al., Defendants.

No. 99 CV 1988(JBW).

United States District Court,
E.D. New York.

March 3, 2000.

Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, by Steven E. Fineman, Robert J. Nelson, for Plaintiffs.

Simpson, Thacher & Bartlett, New York City, by Joseph M. McLaughlin, Ronald M. Neumann, Michael P. Panagrossi, for Defendants.

*AMENDED MEMORANDUM
AND ORDER*

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................98

II. STANDARD OF PROOF .................................................98

III. FACTS ................................................................99
 A. BAT's Organization...............................................99
 B. The 1976 "Scheme of Arrangement" .............................100
 C. BAT's New York Contacts.......................................100
 D. Tobacco Industry Conspiracy ..................................100
 E. New York as a Situs of the Tobacco Industry Conspiracy ..................106
 F. BAT's Tortious Conduct in Furtherance of the Conspiracy ..................107

 1. Perpetuation of False Smoking and Health Scientific "Controversy" ........107
 2. Suppression of Safer Cigarette .........................................113
 3. Manipulation of Nicotine ..............................................114
 4. Acting in Concert with B & W to Hide Information.......................116

 G. BAT's Extensive Participation in the Marketing and in Research and Development of Cigarettes ........................................118

IV. NEW YORK STATUTORY BASES FOR JURISDICTION .....................119
 A. Conspiracy Theory of Jurisdiction ........................................119
 1. Law................................................................119
 2. Application of Law to Facts ...........................................120
 a. Prima Facie Showing of Conspiracy .............................122
 b. BAT's Relationship to the Tobacco Conspiracy and the New York Acts of its Co–Conspirators ..............................123

 B. Other Theories of Personal Jurisdiction ..................................124
 1. CPLR 302(a)(3)(ii) ..................................................124
 2. CPLR 301 ..........................................................125

V. DUE PROCESS .......................................................126
 A. Law ...........................................................126
 1. Minimum Contacts.................................................127
 a. Membership in a Conspiracy......................................127
 b. Intentional Tortious Acts Aimed at the Forum ....................128

 2. Reasonableness..................................................128
 3. Adaptation of Due Process to Mass Tort Context ........................129

 B. Application of Law to Facts .........................................132
 1. Minimum Contacts...............................................132
 2. Reasonableness..................................................133
 3. Mass Torts Due Process Standard ...................................137

VI. Conclusion ...............................................137

## I. INTRODUCTION

This case poses the question: can a foreign national holding company always shield itself against a mass tort suit in New York? In this instance it cannot. It may not hide behind narrow jurisdictional concepts created for another day when its own acts and those of its co-conspirators have allegedly caused great harm in this state.

Plaintiffs sue various tobacco companies and affiliated organizations in a nationwide smoker personal injury class action. They allege that for decades the tobacco industry, in the face of what it knew was overwhelming evidence of the addictiveness of nicotine and of the adverse health consequences of smoking, has conspired to deceive the American public, including the plaintiffs.

B.A.T. Industries, p.l.c. ("BAT"), the British holding company parent of United States defendant, Brown & Williamson Tobacco Corp. ("B & W"), has moved to dismiss for lack of personal jurisdiction. It claims that it is a passive stockholding parent corporation with no connection to the fraud and conspiracy alleged by the plaintiffs. BAT's motion was denied by order dated July 19, 1999. This amended memorandum explains the basis for the denial.

BAT is a quintessential example of a sophisticated holding company presiding over a multinational corporate empire whose operations span the globe. Through the promulgation of binding company-wide policies and long distance active participation in the large-scale marketing, research, and development of cigarettes, it is regnant in the cigarette industry in the United States and throughout the world. Its sway is an aspect of today's global technological-commercial community, in which the click of a mouse may affect events unfolding thousands of miles away and concepts of sovereignty for jurisdictional purposes have eroded. BAT's conduct has supranational effects. It must accept the price of its international ascendancy by defending suits here in the United States, where it has allegedly been responsible for massive damage.

## II. STANDARD OF PROOF

Predicating subject matter jurisdiction on diversity of citizenship, plaintiffs' Amended Complaint alleges causes of action sounding in negligence, strict product liability, fraudulent concealment and civil conspiracy.

The instant motion challenging personal jurisdiction was filed pursuant to Rule 12(b)(2). Plaintiffs presented over five hundred exhibits from prior litigations in opposition. BAT responded with more documents. Given the voluminousness of the submissions, the motion was converted to one for summary judgment with the parties' consent.

The burden of establishing personal jurisdiction is on the plaintiffs. The extent of this obligation depends both upon whether discovery has taken place and upon the nature of the jurisdictional challenge. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). "Prior to discovery, a plaintiff challenged by a jurisdiction test-

ing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction." *Id.* (citation omitted). Where relevant discovery has been extensive, the plaintiff's allegations must be supported by "an averment of facts that if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.*

█ If personal jurisdiction is, as here, contested via a summary judgment motion, "the court proceeds, as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought." *Id.; see also* Fed.R.Civ.P. 56. Ultimately, the plaintiff bears the burden of establishing personal jurisdiction over the defendant by a preponderance of the evidence, either at an evidentiary hearing or at trial. *See, e.g., Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 154 (2d Cir.1999); *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). Short of such a hearing or a trial, plaintiff's burden remains to establish a prima facie case. *See Tilyou v. Carroll,* No. 92 CV 0750, 1992 WL 170916, at *3 (E.D.N.Y. July 2, 1992).

Since there has been neither a factual hearing nor a trial, but discovery has been substantial, plaintiffs must establish a factually supported prima facie case of jurisdiction. They have done so, as the following discussion demonstrates.

## III. FACTS

### A. BAT's Organization

BAT is a holding company based in London, England and incorporated under the laws of England and Wales. Its existence dates to 1976, when it became the controlling parent corporation of the British American Tobacco Company, Ltd. ("BATCo"). BAT currently has over five hundred subsidiaries in some forty countries primarily engaged in the tobacco and financial services businesses. The majority of its revenues derive from its tobacco-related activities. *See, e.g.,* Pls.' Ex. 165 at

14 (BAT Directors' Report and Accounts 1995).

BAT bills itself as "the world's most international cigarette manufacturer" owning the leading cigarette brand in over thirty different markets. *See, e.g.,* Pls.' Ex. 167 at 2 (Facts and Figures 1996). In 1995, it sold 670 billion cigarettes, achieving a 12.4 percent share of the world market. *See id.* A substantial percentage of these cigarettes were purchased by United States smokers.

In public filings and promotional documents, BAT sometimes refers to itself as the "BAT Group," the "B.A.T. Industries Group," or "the Group." This term is used by BAT to collectively describe the entire family of its affiliated companies.

BATCo is a United Kingdom-based corporation that sells tobacco products and conducts tobacco-related scientific research. From 1902 until its 1976 acquisition by BAT, it was the controlling parent company of the BAT Group, which consisted of hundreds of tobacco subsidiaries. It acquired the stock of B & W in 1927. At the time of its acquisition by BAT, BATCo produced over 300 cigarette brands worldwide and produced the leading cigarette in forty countries. *See* Pls.' Ex. 25 at 15. Its most profitable area of operation was North America. *Id.* BATCo also "devote[d] considerable resources to research and development relating to tobacco" and "played a prominent part in research associated with problems of smoking and health." *Id.* at 16. Since 1976, BATCo has continued to operate as a BAT Group tobacco company. In 1998, BATCo changed its name to British American Tobacco (Investments) Limited.

BATUS, a Delaware corporation based in Louisville, Kentucky, is a wholly owned subsidiary of BAT. It holds the shares of B & W and BAT's other United States interests.

B & W is a Delaware Corporation based in Louisville Kentucky. It is the third largest cigarette company in the United

States market. Its domestic brands include Kool, Carlton, Pall Mall and Viceroy. B & W exports such leading international brands as Kent, Lucky Strike, Barclay and Capri. *See* Pls.' Ex. 166 at 12 (BAT Industries Facts and Figures 1995). Since 1976, B & W has been an indirect wholly-owned subsidiary of BAT.

## B. The 1976 "Scheme of Arrangement"

On July 23, 1976, as part of what is known in the United Kingdom as a "Scheme of Arrangement," the Tobacco Securities Trust Company ("TST") became the sole ordinary shareholder of BATCo. TST then changed its name to B.A.T. Industries Limited, which was ultimately changed to B.A.T. Industries, p.l.c. in 1981. The Scheme of Arrangement was undertaken to "facilitate the development of the divisional organization begun by BAT in 1973." Pls.' Ex. 24 at 1 (Joint Statement by British American Tobacco Co., Ltd. and Tobacco Securities Trust Co., Ltd.).

## C. BAT's New York Contacts

BAT has no New York office, mailing address, phone listing, or bank account and pays no New York taxes. It does not directly own, use or possess any New York real estate.

BAT neither manufactures nor sells cigarettes. These functions are carried out by its tobacco subsidiaries, one of which is B & W. B & W currently has a United States market share of eighteen percent. *See* Pls.' Ex. 167 at 13. Since 1987 the BAT Group has earned billions in pre-tax dollar profits from its United States tobacco operations. *See* Plaintiffs' Proffer of Facts at B–2. While the percentage of these profits ultimately traceable to New York is unclear, B & W's strong market presence and the size of the New York population strongly support the inference of substantial New York cigarette sales roughly proportional to the percentage of New York residents in the total United States population—somewhere in the neighborhood of seven percent. Thus, for purposes of this jurisdiction motion, it can be inferred that BAT's earnings in New York through B & W in the last decade were many millions of dollars.

Some of BAT's major institutional investors have been based in New York. *See, e.g.,* Pls.' Ex. 207 (listing Oppenheimer Capital Management, Chancellor Capital Management and Manufacturers Hanover Trust, all New York-based, among the largest American Depositary Receipt owners of BAT). BAT Board Members and other representatives have visited New York frequently in connection with BAT's solicitation of investors. *See, e.g.,* Pls.' Ex. 204 (suggested program for June 1990 visit to United States featuring group and one-on-one investor meetings in New York and a Dinner for "Friends of B.A.T." in New York); Pls.' Ex. 213 (report on October 1990 meetings in New York with six or seven key investors); Pls.' Ex. 226 (itinerary for BAT Chairman's visit to New York in August 1991); Pls.' Ex. 241 (invitation to BAT luncheon hosted by First Boston Corp. on October 1, 1992 in New York).

## D. Tobacco Industry Conspiracy

Plaintiffs allege that BAT participated in a conspiracy to manufacture hazardous products and deceive American consumers about the adverse health consequences of using them. The available evidence of such a conspiracy is substantial.

The exhibits submitted in opposition to BAT's motion to dismiss focus largely on the conduct of BAT itself. For purposes of this memorandum, they are supplemented by widely publicized B & W documents—now posted on the website of the University of California at San Francisco's Library and Center for Knowledge Management—demonstrating the existence of an industry-wide conspiracy with significant links to New York. *See* http://www.library.ucsf.edu/tobacco; *see also* transcript of hearing in *Brown & Williamson Tobacco Corp. v. Regents of University of California,* No. 96–7298 (Cal.Super.Ct. May 25, 1995) (B & W was not entitled to return of company documents or other relief in view

of strong public interest in the information they contained, most of which was already in the hands of the media and known to the public); Stanton A. Glantz et al., *The Cigarette Papers* (1996); Lisa Bero, et al., *Lawyer Control of the Tobacco Industry's External Research Program: The Brown and Williamson Documents,* 274 JAMA 241 (1995). Documents from this website are referred to by document number using the notation, "Doc. No." Any objection to the court's reliance on them has been waived by BAT. *See* transcript of hearing dated Dec. 23, 1999.

B & W, BAT's United States subsidiary, objects to the use of a number of these documents as well as to some of the plaintiffs' exhibits relied upon in the discussion which follows. B & W is, however, not a party to the instant motion. It has not waived any right or privilege in connection with the use of the documents in question, but it must postpone its objections until it can appropriately raise them on its own behalf.

The modern era of smoking and health research is generally said to have begun around 1900 with observations by vital statisticians of an increased incidence of lung cancer. *See* Susan Wagner, *Cigarette Country* 68 (1971). Yet, it was not until the early to mid-1950's, when a series of important studies linking smoking to cancer in humans and animals was published, that the health consequences of smoking became a public issue in the United States. *See id.* at 76–78 (citing articles). Reacting, the United States tobacco companies jointly formed the Tobacco Industry Research Committee ("TIRC"). A January 1954 newspaper advertisement published nationwide announced TIRC's formation. Entitled "A Frank Statement to Cigarette Smokers," the advertisement was signed by the heads of most of the major tobacco companies, including B & W. *See* Pls.' Ex. 1. This original tobacco industry "position paper" playing down the connection between cigarettes and disease is worth quoting at length:

Recent reports on experiments with animals have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.

Although conducted by doctors of professional standing these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed.

At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments. Distinguished authorities point out:

1. That medical research of recent years indicates many possible causes of lung cancer.

2. That there is no agreement among the authorities regarding what the cause is.

3. That *there is no proof that cigarette smoking is one of the causes.*

4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists

We accept an interest in people's health as a basic responsibility paramount to every other consideration in our business.

*We believe the products we make are not injurious to health.*

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years, tobacco has given solace; relaxation and enjoyment .... At one time or another ... critics have held it responsible for practically every disease of the human body. One

by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of serious disease is a matter of deep concern for us.

Many people have asked us what we are doing to meet the public's concern aroused by the recent reports. Here is the answer:

1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies.

2. For this purpose *we are establishing a joint industry group* consisting initially of the undersigned. This group will be *known as Tobacco Industry Research Committee.*

3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it.

Pls.' Ex. 1 (emphasis added).

The documents reveal that TIRC was the product of the tobacco industry's public relations, legal and political needs rather than of any concern for public health. A 1973 memorandum by B & W's general counsel, Ernest Pepples, describes the multiple functions of TIRC, later renamed the Council for Tobacco Research ("CTR"):

Originally CTR was organized as a *public relations effort.* The industry told the world CTR would look at the dis-

eases which were being associated with smoking. There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The research of CTR also discharged a *legal responsibility.* The manufacturer has a duty to know its product. The Scientific Advisory Board composed of highly reputable independent scientists constitute a place where the present state of the art is constantly being updated. Theoretically SAB is showing us the way in a highly complex field. There is another *political need for research.* Recently it has been suggested that CTR or industry research should enable us to give quick responses to new developments in the propaganda of the avid anti-smoking groups. For example, CTR or someone should be able to rebut the suggestion that smokers suffer from a peculiar disease, as widely alleged in the press some few months ago.

Doc. No.2010.02 at 2 (emphasis added); *see also* Doc. No.2010.03 (memorandum by Mr. Pepples to B & W's then Chairman and CEO discussing "two aspects of particular value in CTR: (1)the direct legal protection derived by Brown & Williamson and (2) the political and public relations advantage accruing to the industry"). In another memorandum, Mr. Pepples elaborated on the "litigation value" of CTR:

[CTR] avoids the research dilemma presented to the responsible manufacturer of cigarettes, which on the one hand needs to know the state of the art and on the other hand can not afford the risk of having in-house work turn sour.

. . . .

The point here is the value of having CTR doing work in a nondirected and independent fashion as contrasted with work either in-house or under B & W contract which, if it goes wrong, can become the smoking pistol in a lawsuit.

*Id. cf.* Doc. No.2029.02 (memorandum dated Mar. 11, 1982 from Mr. Pepples to B & W's head smoking and health researcher;

"I have asked that all of the recent proposals for industry *funding of scientific work* be directed to you for a review. As you know these projects *arise out of a law concern.* However, it is also most important that we voice any 'scientific' objection to them early on in the initiation process." (emphasis added)).

Four years after it created TIRC, the tobacco industry established the Tobacco Institute ("TI") as its lobbying and public relations arm. TI has served as the industry's "focal point for criticism of research that indicates a connection between smoking and health." Pls.' Ex. 22 (Industry Response to Cigarette/Health Controversy). The New York public relations firm of Hill & Knowlton ("H & K") appears to have been instrumental in the formation of TIRC and TI and to have played a dominant role in both organizations. An undated memorandum characterizes H & K as "so intimately involved in the affairs of both [TI and TIRC] that a proper separation of functions . . . is virtually impossible in this brief summary." Doc. No.1902.05 at 1, *quoted in* Glantz, *supra,* at 39–40. The memorandum also discusses staff overlap between TIRC, TI and H & K and states that an H & K employee served as both the executive director of TIRC and the executive secretary of its Scientific Advisory Board, making him "without question . . . the administrative head of TIRC." *Id.*

During the early 1960's, both the British Royal College of Physicians and the United States Surgeon General published reports identifying cigarette smoking as a cause of lung cancer. The British report was issued in 1962. *See* Glantz, *supra,* at 46–47. The Surgeon General's report on smoking and health followed two years later. *See* Public Health Service, U.S. Department of Health, Education and Welfare, Pub. No. 1103, *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service* (1964) ("Surgeon General's Report"). It concluded that

smoking is causally related to lung cancer in men; the magnitude of the effect of smoking far outweighs all other factors. The data for women, though less extensive, point in the same direction. *Id.* at 37. The report also named cigarette smoking as the prime cause of chronic bronchitis in the United States. *See id.* at 38.

Available documents indicate that the industry, acting as a whole and with the implicit cooperation of all its members, reacted to the rising tide of public concern resulting from the issuance of these reports by embarking on an advertising campaign designed, among other things, to discredit the evidence of a causal link between smoking and disease. In 1967, for example, TI reprinted as an advertisement an editorial that had appeared on the front page of Barron's several weeks before. *See* Glantz, *supra,* at 176. The advertisement characterized the Surgeon General's Report as "a seemingly well-intentioned, if disturbing, effort to brainwash the citizenry into kicking the habit" and of seeking to condemn smoking by "a kind of guilt by statistical association." *Id.* at 177. It stated:

"Smoking and Health" failed to prove that cigarets [sic] cause lung cancer or any other of the many ills to which the flesh is heir. With the passage of time, its findings have grown increasingly suspect.

*Id.* In a letter to the public relations firm which prepared the Barron's advertisement, B & W's president expressed satisfaction with the result and stated that "perhaps the most important thing about this ad was that for the first time *we have gotten the industry to take a step forward together,* and it was a great opportunity to get them together." Doc. No. 2101.06 (emphasis added).

Individual companies participated in the public relations effort to undermine the scientific evidence on causation. In 1969, for example, a series of advertisements was developed for B & W focusing on the

lack of proof of causation and the individual's right to smoke. *See* Doc. No. 2110.01–05. One of these advertisements belittles the evidence of a causal link by equating it with other supposed "cancer scares":

> Ten years ago, there was a cancer scare over the wax in milk cartons. And over using iodine to get a suntan. These theories were about as valid as the one that says toads cause warts.
>
> And they're about as valid as today's scare-tactics surrounding cigarettes. Because no one has been able to produce conclusive proof that cigarette smoking causes cancer. Scientific, biological, clinical, or any other kind.

Doc. No. 2110.01.

Additional B & W documents refer to "Project A" and "Project B," two "public issue" advertising campaigns developed in 1970. *See* Doc. No. 1001.01 at 12 (Definition of the Brown & Williamson Subjective Coding Taxonomy). "Project A," apparently proposed by R.J. Reynolds but ultimately rejected by the networks, consisted of three television advertisements on smoking and health which were to have been produced and supplied to the six tobacco companies through TI and substituted for the companies' own prime time commercials. *See* Doc. No. 2112.04, at p. 1. "Project B" was comprised of two short advertisements seeking to undercut evidence of the health dangers of cigarettes by portraying it as overblown and exaggerated. The first, for example, declared:

> You've seen the anti-smoking commercials. Dramatic and frightening, they do not appeal to your reason, but rather to your emotions. The fact is, a clear and consistent picture does not emerge from research findings concerning smoking and health. Many statistical connections have been cited against smoking—but these figures work both ways. *Some figures* which are as questionable as any others, for instance, *indicate that people who smoke moderately are actually healthier than non smokers.*

Doc. No. 2112.02 (emphasis added); *see also* Doc. No. 2112.05 (comments by B & W executives on Project B).

In addition to research grants awarded by its Scientific Advisory Board, the CTR funded "special projects" designed largely to generate research data and witnesses for use in defending lawsuits and opposing tobacco regulation. *See* Doc. No.2010.02, at 2 (memorandum by Mr. Pepples to B & W's chairman and CEO; "the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum"); *see also, e.g.,* Doc. Nos.2048.13–2048.23 (Special Project Lists from 1978–80 and 1983–84).

Many CTR "special projects" appear to have been intended either to refute evidence of the health consequences of smoking or to divert attention from this evidence by providing alternate explanations for tobacco-related diseases. Research conducted by "special projects" grantees included: "A Study of the Models Used in the Analysis of Certain Medical Data" (review of the appropriateness of treating biomedical data with the multivariate techniques of assumed normality)," *see* Doc No.2048.13 at 4, "(1) 'Preliminary Study of Interrelationships and Causal Paths Linking Smoking, Personality, and Health Variables,'" and "(2) 'Assessment of the Relationship Between Methodological Quality of Previous Smoking and Health Studies and Their Results,'" *see* Doc. No.2048.29 at 5, "The Study of Architectural, Ventilation and Lighting Factors in Relation to Office Building Illness," *see* Doc. No. at 2048.23 at 4, "Genetic Aspects of Lung Cancer" *see* Doc. No.2048.23 at 2, "Retrospective Analysis of Environmental Contacts of Patients with Respiratory Cancer, Other Cancers, and Other Diseases," *see* Doc. No.2048.14 at 6, and "Autopsy Study Designed to Examine Accuracy of Lung Cancer Diagnoses (Investigators Checking Autopsy Records of University Hospitals for Period Extending from 1948 to 1974

for Errors in Diagnoses)," *see* Doc. No.2048.13 at 6.

The documents reveal that tobacco industry lawyers were heavily involved in the selection and funding of CTR "special projects." Timothy Finnegan of the New York law firm of Jacob Medinger & Finnegan ("JM & F") appears to have played a particularly prominent role. For example, in a letter dated July 2, 1985, Mr. Finnegan recommended approval of a $275,000 grant to Doctors Seltzer and van den Berg, whose prior CTR-funded work had focused on "various characteristics of children prior to their making a decision of whether or not to smoke" and was thus "directly related to the constitutional or genetic hypothesis." Doc. No.2004.29; *see also* Doc. No.2031 at 3 (Dr. Carl Seltzer listed as "special project" grant recipient for "Continuation of Work on Constitutional Differences Between Smokers and Nonsmokers"); Doc. No.2034.02 at 2 (letter from Mr. Finnegan dated May 16, 1983 recommending funding Dr. Henry Rothschild's research into possible genetic markers associated with lung cancer as a CTR special project); Doc. No.2034.01 (letter from B & W agreeing with [Mr. Finnegan's] recommendation); Doc. No.2015.02 at 2 (letter from Mr. Finnegan dated Feb. 15, 1982 recommending awarding a CTR "special project" grant of $25,000 to Dr. Rothschild for research on genetic aspects of lung cancer); Doc. No.2034.06 (letter from B & W agreeing with Mr. Finnegan's recommendation); Doc. No.2031.01 at 2 (Special Projects List showing $25,000 grant to Dr. Rothschild for work on "Genetic Aspects of Lung Cancer"); Doc. No.2024.02 (letter from Mr. Finnegan, dated June 29, 1981 recommending a $20,000 grant to Dr. Schrauzer for research on the concentration of selenium—a possible anti-carcinogen—in tobacco products).

Mr. Finnegan's involvement appears to have gone well beyond funding recommendations to monitoring ongoing research. *See, e.g.,* Doc. No.2017.07 (letter dated June 16, 1981 from Dr. Blass of the Burke Rehabilitation Center reporting to Mr. Finnegan that "we now have evidence that appropriate doses of nicotine can benefit animals with experimental diseases affecting the brain"); Doc. No.2034.18 (letter dated April 17, 1979 from Dr. Rothschild to Mr. Finnegan enclosing a draft of a paper for submission to the New England Journal of Medicine and requesting his comments prior to submission; "I would appreciate if you could let us have your comments by the 24th or 25th so that we can send it off before the end of the month."); Doc. No.2017.06 (internal B & W memorandum to B & W's general counsel; "At your request, Tim [Finnegan] visited Dean Sullivan. It was a cordial meeting and Tim believes he has persuaded them to take a new thrust with their research. The new thrust will have questionable value but no negative.").

The Kansas City firm of Shook, Hardy & Bacon ("SH & B") was also active in the "special projects" area. *See, e.g.,* Doc. No.2022.03 (letter dated April 22, 1981 from William Shinn of SH & B recommending funding of Drs. T.D. and Elia Sterling for investigation of "Office Building Syndrome," which "could be useful with respect to the controversial issue of restriction of smoking in the workplace"); Doc. No.2004.01 (letter dated April 15, 1976 from Donald K. Hoel of SH & B stating firm's view that Dr. Seltzer's "contributions to the world literature merit continued support as a CTR Special Project.").

Such extensive lawyer involvement is in sharp contrast to the tobacco industry's announcement at CTR's inception that its research activities would be overseen by an advisory board of "disinterested scientists." *See* Doc. No.1903.03 at 1 ("Tobacco Industry Research Committee, Organization and Policy"; "The Scientific Advisory Board has full responsibility for research policy and programming.").

Many "special projects" recipients were also awarded funds through "Special Account 4." See Doc. No.2042.01 (listing as

"Special Account Number 4 Recipients" Drs. Rothschild, Seltzer, Sterling and Schrauzer). This account, administered by JM & F, was apparently one of two "special accounts" devoted to such matters as witness preparation and funding of research by expert witnesses. *See* Doc. No.2010.01 (letter dated Feb. 9, 1973 from SH & B to general counsel of tobacco companies); Doc. No. 1000.01 at 54 (Master Summary for B & W Subjective Document Review). Some of these "special projects" and "special accounts" scientists appear to have had retainer-like relationships with their tobacco industry sponsors. The tobacco companies' investment in the work of Dr. Carl Seltzer, whose view was that a causal connection between smoking and coronary heart disease had not been established, seems to have been particularly fruitful. For example, in 1979, Dr. Seltzer traveled to Australia and New Zealand, where he related his views on smoking and heart disease to tobacco industry representatives and science writers. *See* Doc. No.2004.12 (letter dated May 17, 1979 from SH & B to general counsel of tobacco companies pronouncing Dr. Seltzer's visit a success). After an interview on the Framingham heart study was aired on the MacNeil/Lehrer News Hour, Dr. Seltzer was requested to and did write a letter to Mr. MacNeil taking issue with the interviewee's presentation of the data linking smoking to heart disease and stating his own position that causation had not been proved. *See* Doc. No.2004.23 (letter dated Feb. 20, 1984 from B & W general counsel noting request and enclosing copy of Dr. Seltzer's letter to Mr. MacNeil); Doc. No 2004.25 (Dr. Seltzer's letter dated January 31, 1984 to Mr. MacNeil); *See also* Doc. No.2004.21 (letter dated April 4, 1983 recommending "special projects" funding for Dr. Seltzer and listing the preparation of a statement on smoking and heart disease for a congressional subcommittee and meetings with smoking and health researchers among his activities during the previous year).

A 1980 letter to the general counsel of the tobacco companies from SH & B discusses the helpfulness of Dr. Sterling, another "special projects" and "special account 4" recipient:

> Dr. Sterling has continued to be helpful in frequent consultations about the smoking and health controversy. He testified at congressional hearings on public smoking in October, 1978; he has given several technical papers at professional meetings recently; and has prepared a number of manuscripts, some of which have been published.

Doc. No.2020.06 at 1–2; *see also* Doc. No.2022.06 (1981 letter from SH & B to tobacco companies' general counsel; "As in the past, Dr. Sterling has used the support received from his grant to develop proposals for other projects. The flexibility inherent in the current arrangement has also provided Dr. Sterling with the ability to respond quickly to new scientific developments."); *see also* Doc. No.2022.03 at 2 (letter dated April 22, 1981 recommending funding for Dr. Sterling's research on "Office Building Syndrome" and noting Dr. Sterling's other activities, including a presentation entitled "Job Discrimination Based on Exposure Considerations and Smoking" at an occupational health meeting).

## E. New York as a Situs of the Tobacco Industry Conspiracy

Multiple events and actors link the tobacco industry conspiracy alleged by the plaintiffs to New York. First, Philip Morris, Inc. and Lorillard Corp., co-defendants and alleged co-conspirators of BAT, have their principal places of business in New York City. *See* Amended Complaint at ¶¶ 20, 25. Both companies have apparently been headquartered in New York for many years. *See, e.g.,* Doc. No.2017.04 (letter dated Oct. 13, 1980 on Lorillard letterhead bearing a New York City address); Doc. No.1905.01 (letter from CTR dated December 28, 1970 addressed to,

among others, Philip Morris, Inc. in New York).

The available evidence implicates Lorillard and Philip Morris in industry activities aimed at promoting the deceptive notion of a smoking and health scientific "controversy." Both companies have been members of CTR from its inception. *See* Pls.' Ex. 1; Doc. Nos.1902.02–03. Over the years, numerous law firm letters seeking approval for CTR "special projects" and reporting on grant recipients' activities were directed to Arthur J. Stevens and Thomas F. Ahrensfeld general counsel of Lorillard and Philip Morris, respectively. *See, e.g.,* Doc. No.2004.01 (seeking approval of "special project" funding for Dr. Seltzer's work on "constitution and disease"); Doc. No.2004.05 (letter dated Aug. 7, 1978 recommending that a study of former smokers' coronary heart disease rates be funded as a "special project"); Doc. No.2022.03 (letter dated April 22, 1981 requesting "special project" funds for study of "Office Building Syndrome"); Doc. No.2004.12 (letter dated May 17, 1979 enclosing newspaper articles on Dr. Seltzer's trip to Australia and New Zealand to discuss his views on smoking and heart disease); Doc. No.2007.05 (status report dated Oct. 24, 1979 on Dr. Domingo Aviado); Doc. No.2034.09 (letter dated Aug. 4, 1980 enclosing progress report on work of Dr. Rothschild); Doc. No.2009.05 (letter dated Oct. 31, 1978 enclosing copy of Dr. Rothschild's article entitled "The Bandwagons of Medicine"). These documents support an inference of ongoing New York activities in furtherance of the alleged conspiracy.

CTR and TI, major vehicles for perpetuating the tobacco industry's stance on smoking and health, were both incorporated in New York. CTR's offices in New York City generated critical data with which to dispute and deflect attention from the evidence linking smoking to lung cancer, heart disease and other illnesses.

H & K, the public relations firm instrumental in the formation of both CTR and TI, was as already discussed deeply involved in the operation of both these organizations. H & K is a New York corporation with its principal place of business in New York.

JM & F, the law firm which administered "special account 4" and played an important role in CTR "special projects" is located in New York City. Many "special projects" and "special account 4" funding recommendations were written on JM & F's New York letterhead. Approvals of funds were transmitted to the firm in New York. *See, e.g.,* Doc. No.2040.02 (letter dated July 9, 1985 from B & W's general counsel to JM & F in New York approving "special project" funding for Dr. Seltzer); Doc. No.2034.06 (letter dated March 10, 1982 from B & W's general counsel to JM & F in New York approving "special project" funding for Dr. Rothschild).

The activities of CTR, JM & F and H & K further root the alleged tobacco industry conspiracy in New York.

F. BAT's Tortious Conduct in Furtherance of the Conspiracy

BAT contends that the conduct complained of in the instant case is that of its subsidiaries and that the plaintiffs have produced no evidence of independent wrongdoing on its part. The plaintiffs argue that BAT itself participated in the tortious conduct that forms the basis of their suit. Specifically, they allege that BAT instructed its subsidiaries to perpetuate a fraudulent smoking and health position and prohibited them from designing and manufacturing a less harmful product even though they had the technical capability to do so. Plaintiffs further allege that BAT promoted the enhancement of the nicotine content of its subsidiaries' products.

1. Perpetuation of False Smoking and Health Scientific "Controversy"

In March 1984, BAT distributed to the heads of its operating groups a memorandum containing the "Group policy on Smoking and Health Issues," providing that it be given the "widest possible circu-

lation." *See* Pls.' Ex. 40. Entitled "Legal Considerations on Smoking & Health Policy," it stated BAT's position that there was a "genuine scientific controversy" respecting the adverse health effects of smoking, imposed this stance on all subsidiaries, and directed them to consult their legal departments or BAT if "in doubt." The memorandum read:

This note summarizes the policy of the BAT Industries Group in relation to smoking & health issues. Although primarily the concern of the Group's tobacco interests, it is important for senior executives in other parts of the Group to be aware of the stance taken. This is because the spread of 'strict' or 'no fault' liability in the USA, Europe and other industrialized parts of the world may in the future result in the attribution to the Group's tobacco companies of statements made or decisions taken by other BAT Industries subsidiaries.

For this reason it is essential that statements about cigarette smoking or the smoking and health issue generally must be factually and scientifically correct. The issue is controversial and there is no case for either condemning or encouraging smoking. It may be responsible for the alleged smoking related diseases or it may not. No conclusive scientific evidence has been advanced and the statistical association does not amount to proof of cause and effect. Thus a genuine scientific controversy exists.

The Group's position is that causation has not been proved and that we do not ourselves make health claims for tobacco products. Consequently the Group cannot participate in any campaigns stressing the benefits of a moderate level of cigarette consumption, of cigarettes with low tar and/or nicotine deliveries or any other positive aspects of smoking except those concerned with the dissemination of objective information and the right of individuals to choose whether or not they smoke. However, the Group encourages constructive dialogue with the authorities, the dissemination of information about the smoking and health controversy and research and new product development.

*Id.* This policy was binding on all BAT Group companies:

Non-tobacco companies in the Group must particularly beware of any commercial activities or conduct which could be construed as *discrimination against tobacco or tobacco manufacturers (whether or not involving companies within the Group),* since this *could adversely affect the position of Brown & Williamson* in current U.S. product liability litigation in the US. If in doubt, companies should not hesitate to consult their in house counsel, or BAT Industries Legal Department, who have up-to-date information on the legal situation affecting the tobacco companies.

*Id.* (emphasis added).

The evidence in the record indicates that at the time this policy statement denying proof of tobacco-caused disease was issued, BAT had long known that it was highly probable that smoking did cause disease. The same year BAT was formed, Dr. Sidney J. Green, head of Research and Development at BATCo stated his opinion that "it may ... be concluded that for certain groups of people smoking causes the incidence of certain diseases to be higher than it would otherwise be." Pls.' Ex. 28 at 4.

Two years later, in 1978, Dr. Green wrote: "The statement [is] made that 'studies have shown that lung-cancer death rate is almost directly related to the number of cigarettes consumed' .... [That] statement is clearly true ...." Pls. Ex. 355. BAT Group scientists attending a research conference that same year apparently agreed with Dr. Green's assessment. According to the conference minutes, they concluded:

There has been no change in the scientific basis for the case against smoking. Additional evidence of smoke-dose related incidence of some diseases associated

with smoking has been published. But generally this has long ceased to be an area for scientific controversy.

Pls.' Ex. 129 at 1.

In "Smoking, Associated Diseases and Causality," an undated document written sometime after the issuance of the 1979 Surgeon General's report, to which it refers, Dr. Green described the tobacco industry as having "publicly retreated behind impossible, perhaps ridiculous, demands for what in their public relations is called 'scientific proof.'" Pls.' Ex. 406 at 1. He further stated: "The position of the industry might call for some sympathy, on the other hand there is a great deal more against smoking than the epidemiological evidence." *Id.* at 1–2. Dr. Green then provided the following assessment of the tobacco industry's position:

> [T]he argument that since there are heavy smokers who do not have lung cancer (and, of course, the majority do not) and because there are some rare cases of nonsmokers who do have lung cancer then smoking does not cause lung cancer, is totally fallacious. From all the evidence that smoking is a factor in multiple correlations and is strongly associated with some diseases then after meticulous experimentation by selecting otherwise comparable populations the claim that smoking causes some diseases (i.e. causes the incidence of the diseases in the population to increase) may well be proven. If it can be reliably predicted that if smoking is decreased in a population that the incidence of this or that disease will be decreased than the decrease demonstrates the causal relationship. Thus for male smokers in the U.K., the U.S.A., and several other countries from the epidemiological evidence alone it can be concluded that smoking cigarettes causes lung cancer and some other respiratory diseases.

*Id.* at 4–5.

■ Dr. Green, as BATCo's head of Research and Development was technically not a BAT employee. Thus, in the absence of an agency relationship or a basis for piercing the corporate veil, his actions and those of other BATCo scientists may arguably not be attributed to BAT. Nevertheless, *the knowledge of BATCo* and its research and development staff *is properly imputed to BAT.* BATCo conducted Group tobacco research for its hundreds of subsidiaries for decades before its 1976 acquisition by BAT. *See, e.g.,* Pls.' Ex. 10 (British–American Tobacco Company, Ltd., Biological Testing: Short–Term Hyperplasia Test, dated June 24, 1966); Pls.' Ex. 113 (Preparation and Properties of Nicotine Analogues, Group Research and Development Centre, dated November 9, 1972); Pls.' Ex. 115 (Further Studies on the Effect of Nicotine on Human Physiological Response, Group Research & Development Centre, dated June 5, 1973); Pls.' Ex. 2 (Final Report on Project Hippo I, dated January, 1962); Pls.' Ex. 4 (Final Report on Project Hippo II, dated March 1, 1963). Its central research role continued after 1976. *See* Pls.' Ex. 126 (Some Benefits of Smoking, Group Research and Development Centre, dated January 26, 1977); Pls.' Ex. 127 (A Comparison of the Tumorgenic Activities of Janus Condensates B0, B2 and B4, Group Research & Development Centre, dated January 24, 1977); Pls.' Ex. 132 (Preparation and Properties of Nicotine Analogues–Part III, Group Research & Development Centre, dated June 20, 1979); Pls.' Ex. 135 (Nicotine Studies: A Second Report. Estimation of Whole Body Nicotine Dose by Urinary Nicotine and Cotinine Measurement, GR & DC, dated May 28, 1981); *See* Pls.' Ex. 339 (draft of memorandum entitled "Tobacco Research in BAT Industries," dated March 4, 1985) (BATCo to coordinate fundamental research and ensure a flow of information within BAT Group). The fact that during the first few years of BAT's existence, its Board and the BATCo Board were essentially identical, *see* Pls.' Ex. 64, and that BAT's first two Chairmen were former BATCo Chairmen, creates an

especially strong basis for ascribing to BAT BATCo's knowledge that smoking causes human disease.

This knowledge was based on research dating back to the early 1960's. By 1962, tobacco–smoke condensate painted onto the skin of mice had been shown to be carcinogenic, and respiratory irritation was being hypothesized as a potential cause of both chronic bronchitis and cancer in people. *See* Pls.' Ex. 104 (Report on 1962 Southampton Research Conference) at 7, 10, 22. That year, the Royal College of Physicians issued its report linking cigarette smoking to lung cancer, bronchitis and heart disease. In response, the British tobacco industry, through its joint research organization, the Tobacco Manufacturers' Standing Committee, set up a laboratory in Harrogate, England. Harrogate was designed for large scale biological research on the toxicity of cigarette smoke, with a focus on mouse skin painting experiments and studies on the irritation of the respiratory passages.

During the 1960's BATCo's in-house research program was designed to complement and capitalize on the biological research being done at Harrogate. *See id.* at 24. Its research and development laboratories, located in Southampton, England, focused on the chemistry and physics of tobacco smoke, that is to say, on the isolation, enhancement and suppression of individual smoke components. Efforts were largely directed towards the design of a "safe" cigarette. *See* Doc. No. 1109.01 at 1 (file note of B & W scientist on BATCo's 1967 Southampton Research).

In addition, a number of BAT research projects were performed under contract at other laboratories. *See, e.g.,* Pls.' Exs. 2, 4 (Final Reports on nicotine studies Projects Hippo I and II); Pls.' Ex. 108 (Project JANUS Quarterly and Annual Reports 1969–1971) (mouse skin-painting experiments).

At annual research conferences during the 1960's, BAT Group scientists discussed the possibility of producing a "cigarette with lower biological activity on mouse skin painting." Doc. No. 1165.02 at 3 (minutes of 1967 Montreal Group Research and Development Conference); *see also* Pls.' Ex. 106 at 1–2 (minutes of 1968 Hilton Head Group Research and Development Conference; "There was general agreement that a cigarette with such reduced mouse-skin biological activity should be produced."). Also considered was the manipulability of the "biological activity" of cigarettes. *See* Pls.' Ex. 1 at 1 ("It is clear that a number of features of cigarettes can modify the biological activity of smoke condensate. These include the incorporation of [different parts of the tobacco leaf], the form of the smoking vehicle ... the type of tobacco, the presence of additives and the volume of puff taken in smoking the cigarette."). Conference participants distinguished between "Health-image (health reassurance)" cigarettes and "Health-orientated (minimal biological activity)" ones. *Id.* at 2. Scientists attending BATCo's 1969 research conference concluded:

> [A]t the present time the Industry ha[s] to recognize the possibility of distinct adverse health reactions to smoke aerosol:
>
> (a) Lung Cancer
>
> (b) Emphysema and bronchitis
>
> and present and future bioassay test could usefully be classified according to their applicability to one or other or to both.

Pls.' Ex. 107 at 3 (Minutes of 1969 Kronberg Research Conference).

BAT Group efforts to make a less harmful cigarette continued throughout the 1970's. *See, e.g.,* Pls.' Ex. 117 (Notes of 1974 Group Research and Development Conference in Duck Key, Florida); Pls.' Ex. 112 (Notes on 1972 Group Research and Development Conference in Chelwood). By the mid–1970's, a safe product appeared to be more of a long–range goal secondary to the immediate objectives of meeting regulatory requirements and promoting a positive public image. *See* Pls.'

Ex. 121 at 5 (Notes of 1975 Group Research and Development Conference in Merano, Italy) ("As a longer range, and perhaps never ending, objective R & D has a goal of developing products that respond positively to scientific information having relevance to smoking and health."). Even so, BAT Group scientists seem to have viewed production of a "safe" cigarette as feasible. *See* Pls.' Ex. 129 at 1 (Notes of 1978 Research and Development Conference in Sydney, Australia) ("Cigarettes acceptable on all counts can probably be achieved by research and indeed, may in fact be available."). At the close of the 1970's the biological testing program at Southampton was spending £910,000 a year on its biological testing program. *See* Pls.' Ex. 133 at 10 (Notes of Research and Development conference in London 1979). This represented a significant proportion of BAT's total expenditures in this area. *See id.*

Despite its knowledge to the contrary, almost a decade after it first issued its "Legal Considerations" memorandum, BAT continued to adhere to the position that a causal link between smoking and disease had not been established. In December 1993, the 1984 memorandum was circulated anew, along with BAT's 1993 Statement of Business Conduct ("SBC"). *See* Pls.' Ex. 66. In addition, a "Guidance Note" for the implementation of the SBC set forth—under the subheading "Smoking and Health Policy"—"the considered view of the [BAT] Group that ... scientific causation between smoking and diseases allegedly related to smoking has not been established." *Id.* at 14.

The binding effect of BAT's official "Smoking and Health" line on its subsidiaries is revealed by the record. A cover letter from BAT's CEO accompanying the SBC states:

B.A.T. Industries has for many years maintained policies and standards covering various aspects of business conduct and has required their adoption by all B.A.T. Group companies. In order to bring together the underlying principles, the B.A.T. Industries Board has adopted a Statement of Business Conduct which is of general application and which is enclosed. We will also be issuing some guidance in the form of Guidance Notes on specific issues where questions have sometimes arisen in the past.

The Statement and the Guidance Notes clearly reaffirm where the B.A.T. Group stands on key issues .... You will see that *the Board of BAT Industries has authorized a simple system of assurance of compliance throughout the Group* which builds upon current practice.

I believe that the Statement and Guidance Notes will be of use to employees in their day to day work ....

Pls.' Ex. 290 (emphasis added).

The SBC provides that it "applies to all directors, officers and employees of B.A.T. Industries, p.l.c. and its principles apply to all directors, officers and employees of every company within the B.A.T. Industries Group of companies." Pls.' Ex. 66 at 1. The policy was enforceable by discipline against subsidiary employees. BAT did not conceal its warning "that any exception to or breach of the principles encompassed by this Statement will usually be dealt with by immediate management disciplinary action (which may include dismissal in an appropriate case ....)." *Id.*

To help give effect to the uniform BAT stance on the healthfulness of its product, a consumer helpline manual was distributed to BAT Group tobacco companies for use in answering consumers' questions about smoking and health. It instructed:

All companies considering introduction of a consumer helpline must contact Smoking Issues Department, Millbank for advice on how to handle questions relating to the product and to smoking and health.

. . . .

"Type A" markets assume a high public awareness of smoking and health issues

and a strong possibility that users of the helplines will ask questions relating to smoking or product issues.

. . . .

In "Type A" markets, telephone operators may be dealing regularly with people who are asking questions about tobacco or health. Although a more detailed Q & A document is provided for these operators, in all circumstances the operators should receive background training . . . . This training must be provided in collaboration with the Smoking Issues Department, Millbank . . . .

Pls.' Ex. 323. Under the heading "Questions About Smoking and Health," the following sample questions and answers, intended to reassure "Type A" callers about the lack of evidence of adverse health consequences and addicting qualities, were provided:

Knowing how many people die every year from causes related to smoking, do you consider that it is "common sense" to continue to launch into the market products that poison the consumer?

I would like to clarify that it is not scientifically feasible to attribute specific numbers of deaths to cigarettes. We do not understand the mechanisms underlying the diseases claimed to be associated with smoking, and so neither can we fully understand the causes.

. . . . .

Do you think that tobacco is a drug?

We believe that it is not, which is in agreement with the legislation on such matters in force throughout the world. There are many differences between cigarettes and drugs. For example, cigarettes do not cause people to become intoxicated, like so-called "hard" drugs do.

If this is not so, what can you say about the addiction produced by cigarettes?

The mere fact that people say it is difficult to stop doing something, such as stopping smoking, does not mean that behavior constitutes an addiction. Millions of smokers all over the world have stopped smoking voluntarily without any help at all.

. . . . .

What is nicotine?

It is a substance that occurs naturally in the tobacco plant.

*Id.*

Numerous meetings and conferences among BAT and its subsidiaries provided a context for the implementation of BAT's "Smoking and Health" policy. The agendas and meeting minutes of BAT's Tobacco Strategy Review Team ("TSRT") are illustrative. Formed in 1984 and chaired by BAT's Chairman, the TSRT's principal aim was "to ensure that the Group mounts a coherent strategic thrust in Tobacco, that there is effective technical and marketing co-operation between the Group's Tobacco businesses and that there is a unified approach on Smoking Issues." Pls.' Ex. 271.

Initially, the TSRT had been composed of selected members of the BAT Board. In 1988, however, its membership was expanded to include the heads of tobacco operations in each of BAT's Operating Groups, including that in the United States. *See* Pls.' Ex. 282. The record reflects that "Smoking Issues," a euphemism for matters relating to the public's perception of the health consequences of smoking, were a regular agenda item at TSRT meetings. *See, e.g.,* Pls.' Ex. 92 at ¶ 21 (minutes of March 1989 TSRT meeting; presentation of collection of "abstracts of scientific papers demonstrating the anomalies and inconsistencies in the published work on epidemiology, relating to the alleged effects of smoking and health"); Pls.' Ex. 94 at ¶ 15 (minutes of February 1990 TSRT Meeting; discussing upcoming availability and likely annual review and update of two new "Smoking Issues Documents," "Smoking: Habit or Addiction?" and "Smoking: The Scientific

Controversy"); Pls.' Ex. 96 at ¶ 6 (minutes of May, 1990 TSRT meeting; Chairman noted U.K. Sunday Times article critical of the apparent strength of BAT cigarettes sold in certain African countries and stressed importance of being able to defend sale of cigarettes in Africa with higher tar levels than those sold in Europe and North America). "Smoking Issues" were also a recurring topic at the annual Chairman's Advisory Conferences ("CAC's") gatherings hosted by BAT's Chairman and attended by the top brass of its tobacco operating groups from the United States and elsewhere. *See, e.g.,* Pls.' Ex. 303 at 5–12 (minutes of May, 1981 CAC in Austria); Pls. Ex. 304 at 7–10 (minutes of March 1983 CAC in Brazil).

To bolster BAT's position on smoking and health, BATCo was assigned the task of compiling a "Smoking Issues Compendium." *See* Pls.' Ex. 271 at 1 (Note on Tobacco Strategy Review Team). The purpose of this project was to attack the mounting epidemiological evidence that smoking caused disease by "illustrat[ing] the range of material which supported the controversy on smoking issues." Pls.' Ex. 327 at 1 (Minutes of December 1984 Meeting at BAT on Compendium of Epidemiological Studies). The record reflects the ongoing involvement of Pat Sheehy, BAT's Chairman from 1982 through 1995 (and prior to that Chairman of BATCo), in the development and dissemination of the Compendium as well as in the perpetuation of the "debate" on causation. A 1986 "Smoking and Health" memorandum from Mr. Sheehy to "All No. 1's of Tobacco Companies" began: "You will know that I believe we have a strong case, both as an industry and as a company, in refuting the highly emotive claims made by the anti-smoking lobby regarding the dangers of smoking. I have a continuing active involvement in this debate ...." *See* Pls.' Ex. 419. Attached was a paper entitled "Can Epidemiology Become a Rigorous Science? How Big is The Big Kill?," refuting United Kingdom Health Education Council findings on the number of deaths

attributable to smoking. Recipients of the paper were encouraged to use it "in discussions with the authorities and in a more general public relations context in showing that although the alternative view may not be as attractive to the media, the extreme claims made by our opponents can and should be challenged." *Id.; see also* Pls.' Ex. 326 (note of Jan. 27, 1984 on behalf of Mr. Sheehy requesting a meeting to discuss the Compendium); Pls.' Ex. 327; Pls.' Ex. 91 at ¶ 7 (minutes of October 1988 TSRT meeting; Mr. Sheehy emphasized the importance of maintaining pressure on smoking issues and stressed the need to have the Compendium translated into German, Spanish and Portuguese); Pls.' Ex. 92 at ¶ 21 (minutes of March 1989 TSRT meeting; Mr. Sheehy instructed companies to start using the Compendium in appropriate circumstances).

2. Suppression of Safer Cigarette

In 1978, BAT Group scientists concluded that the production of safer cigarettes was possible. *See* Pls.' Ex. 129 at 6 (minutes of 1978 Group Research and Development Conference; "Cigarettes of substantially reduced biological activity (SRBA) can be made by product modification .... By SRBA is meant cigarettes where epidemiology would show no greater incidence of disease for smokers than for non-smokers."). Some years later, a Canadian affiliate, Imasco, broached the possibility of making a greater effort to develop a "safe" cigarette. BAT actively discouraged it from doing so. After the matter was taken up at a TSRT meeting, *see* Pls.' Ex. 276 at ¶ 5, BAT's Chairman, Mr. Sheehy, wrote to Imasco explaining why he could not approve this type of research. One important objection was that "in attempting to develop a 'safe' cigarette you are, by implication in danger of being interpreted as accepting that the current product is 'unsafe' and this is not a position that I think we should take." Pls.' Ex. 386 at 2. Production of a "safe" cigarette, Mr. Sheehy explained, would undermine what had become BAT's chief objective:

"mak[ing] the whole subject of smoking *acceptable* to the authorities and the public at large since this is the real challenge facing the Industry." *Id.* at 1 (emphasis in original). To promote this broader "BAT objective," the Group had adopted an "integrated approach" featuring sponsorship of research on "alternative mechanisms of disease, including psychological or genetic predisposition, as well as probing the simple conclusions of what is probably rather poor epidemiology." *Id.* at 2. Defendants argue that Imasco was only an affiliate of BAT to which Mr. Sheehy was dispensing advice. Given BAT's forty percent interest in Imasco, *see* Reply Affidavit of Philip M. Cook in Support of BAT's Motion to Dismiss for Lack of Personal Jurisdiction at ¶ 19, it is highly unlikely that the latter would have interpreted Mr. Sheehy's comments as mere "advice."

Jeffrey Wigand, B & W's chief researcher during the early 1990's, testified at a deposition in connection with earlier tobacco litigation that he was prohibited from pursuing development of a safer cigarette. Shortly after a meeting of BAT Group research managers, Mr. Wigand testified, B & W's president instructed him to cease all safety activities in this area:

> Sandefur [B & W's president] called me to his office and told me there would be no further discussion or efforts on any issues related to a safer cigarette, even though there was research being conducted in both Canada and in the U.K. in removing [tar].
>
> . . . .
>
> And that any activity or elusion [sic.] to a *safer cigarette would be deathly contrary to the company's position* relative to liability issues associated with smoking and health issues and that the matter would not be pursued any further and I was not to discuss it anymore. He also told me at that time that there will be no scientific and medical advisory committee to provide direction or support to the development of a safer cigarette.

Pls.' Ex. 505 (Wigand Dep. at 59–60) (emphasis added).

### 3. Manipulation of Nicotine

During the early 1960's, BATCo commissioned a series of research projects on nicotine to be performed by the Battelle Laboratory in Geneva, Switzerland. These included "Project Hippo I," a study of the effects of nicotine on stress reduction, weight loss, and other hypothalamic functions, "Project Hippo II," a comparison of nicotine and the tranquilizer, reserpine, and a study of nicotine absorption, distribution and elimination. This latter project engendered a report entitled "The Fate of Nicotine in the Body," which concluded that nicotine "appears to be intimately connected with the phenomena of tobacco habituation (tolerance) and/or addiction." Pls.' Ex. 5 at 1.

During the summer of 1963, BATCo, in consultation with the president and general counsel of B & W, decided against disclosing the results of its nicotine studies to the United States Surgeon General's Advisory Committee on Smoking and Health. *See* Pls.' Ex's 6 (correspondence on nondisclosure of nicotine studies, June 19–July 4, 1963).

Nicotine was a recurring topic at annual BAT Group research conferences during the 1960's and 70's. *See, e.g.,* Pls.' Ex. 110 at 4 (minutes of 1967 Montreal Research Conference; discussion of level of nicotine required by consumer and evidence in Germany that per capita cigarette consumption increased for low nicotine brands); Pls.' Ex. 106 at ¶ 10 (minutes of 1968 Hilton Head Research Conference; "In view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review and attention paid to the possible discovery of substances possessing the desired features of brain stimulation and stress relief without direct effects on the circulatory system."); Pls.' Ex. 109 at ¶ 2(b) (minutes of 1970 St. Adele Research Conference; importance of nicotine and likelihood that a minimum level

would be necessary for consumer acceptance); *id.* at ¶ 51 (possibility that nicotine could be implicated in development of cardiovascular disease warranted close attention to ."developments at Harrogate and Huntingdon"); Pls.' Ex. 117 (minutes of 1974 Duck Key Conference; discussion of smoker compensation; German study suggested "that whatever. the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern to deliver his own nicotine requirements").

"Smoker compensation," the phenomenon of adaptive smoking of "low delivery" cigarettes to ensure a sufficient dosage of nicotine was a major topic of discussion at BAT's 1983 Research and Development Conference. The conferees declared "an urgent need to prepare a status review on all major aspects of the pharmacological influences of nicotine in the smoking process." Pls.' Ex. 139 at ¶ 35. They agreed that as much as possible had to be known about "the site and mechanisms of absorption of nicotine within the human system;" "the way nicotine stimulates both the central nervous system and the peripheral organs (eg heart and lung);" and "the metabolism of nicotine within the body, including rates and equilibrium levels." *Id.* at ¶ 33. To that end, it was proposed that a senior researcher at BAT's laboratory in Southampton assume responsibility for coordinating all relevant work in this area. *See id.* at ¶ 35.

The biological activity of nicotine was also on the agenda of a Biological Conference held in April 1984. *See* Pls.' Ex. 140 at 2. A three-day Nicotine Conference was held several months later. Those in attendance concluded that "[i]ntuitively it is felt that 'satisfaction' must be related to nicotine' and that [m]any people believe it a 'whole body response' [that] involves the action of nicotine in the brain." Pls.' Ex. 140 (Minutes of Nicotine Conference, Southampton, 6th–8th June, 1984). It was also noted that "[a]lthough many smokers appear to approach a plateau ... of nicotine in the blood, it [was] not known ... whether a smoker feels the need for another cigarette when his blood level falls significantly below this plateau level or ... whether the smoker is seeking the more transient peak levels super-imposed upon the general plateau level." *Id.*

The author of an undated memorandum emanating from "R & D, Southampton" characterizes a cigarette as "a 'drug' administration system for public use" and notes speed, i.e., the fact that "[w]ithin 10 seconds of starting to smoke, nicotine is available *in the brain,*" as one of its advantages. Pls.' Ex. 400 (emphasis in original). The memorandum continues:

Thus we have an emerging picture of a fast, highly pharmacologically effective and cheap 'drug,' tobacco, which also confers flavour and manual and oral satisfaction to the user. There are other things about tobacco though. It is legal (as is alcohol but not marijuanha [sic] and LSD), and the articles themselves are eminently portable. It can be used freely in public places in most countries.

So, all in all, it is a relatively cheap and efficient delivery system, legal, and easily usable.

However, it has drawbacks. The major one is that it has a 'health shadow' over it which is not easy to dispel ....

After discussing at length consumer satisfaction and the benefits and drawbacks of lower tar and higher nicotine content, the author cynically concludes:

So—give them what they seem to want taste and value. And always remember that, while King James I issued his famous 'Counterblaste to Tobacco,' in 1604, it is nicer from our point of view to remember Oscar Wilde's words in 'The Picture of Dorian Gray' in 1891:

'A cigarette is the perfect type of a perfect pleasure. It is exquisite, and it leaves one unsatisfied. What more can one want.'

Let us provide the exquisiteness, and hope that they, our consumers, will remain unsatisfied. *All we would want*

*then is a larger bag to carry the money to the bank.*

*Id.* at 10 (emphasis added).

These documents pertain to research done under the auspices of BATCo, much of it well before BAT's formation in 1976. Nonetheless, they strongly support an inference of awareness on the part of BAT that nicotine was the active ingredient in cigarettes. BATCo was BAT's chief research subsidiary until Group research and development was reorganized in 1985. *See* Pls.' Ex. 341 at 1. Even after the reorganization, BATCo retained a central coordinating role in this area. *See id.* The knowledge of BATCo researchers and a basic awareness of matters discussed at BATCo conferences over the years, may be imputed to BAT. The overlapping BAT and BATCo Boards, *see* Pls.' Ex. 64, and the fact that BAT was chaired through 1995 by former BATCo Chairmen makes BAT's reliance on BATCo's scientific background highly likely.

There is ample evidence in the record from which it can be inferred that tobacco with higher nicotine content and tobacco treatment processes that enhanced nicotine delivery were encouraged. For example, the use of Y–1 tobacco, a low-tar high-nicotine strain of tobacco developed by B & W was urged on the heads of the tobacco operating groups. *See* Pls.' Ex. 93 at ¶ 16 (minutes of November 1989 TSRT meeting); Pls.' Ex. 94 at ¶ 4 (minutes of February 1990 TSRT meeting). After limited progress was reported in developing uses for Y–1, BAT's Chairman asked that Y–1 be given a higher priority. *See* Pls.' Ex. 96 at ¶ 9 (minutes of May 1990 TSRT meeting). The Chairman also stressed the importance of ammonia processing, *see* Pls.' Ex. 93 at ¶ 8; Pls.' Ex. 94 at ¶ 6, a taste-enhancing procedure resulting in "[i]mproved nicotine transfer." Pls.' Ex. 357 at 3 (minutes of Ammonia Technology Conference hosted by B & W); *see also* Pls.' Ex. 360 at 18–19 (Blenders Handbook; "Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine. As a result . . . the ratio of extractable to bound nicotine in the smoke may be altered in favor of extractable nicotine . . . . As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster."). B & W's Chairman was charged with ensuring that all Group blenders "were fully conversant with the techniques for ammonia treatment." Pls.' Ex. 94 at ¶ 7. Pursuant to this BAT mandate, a blender's conference was held and a blender's handbook compiled. *See* Pls.' Ex. 98 at ¶ 63–65 (minutes of September 1990 TSRT meeting); Pls.' Ex. 99 at ¶ 49 (minutes of November 1990 TSRT meeting).

### 4. Acting in Concert with B & W to Hide Information

BAT and B & W appear to have worked together to prevent damaging smoking health information generated by BAT Group research from reaching United States product liability plaintiffs and the general American public. The documents reflect tension between B & W and other BAT affiliates due to B & W's greater vulnerability to product liability litigation. *See, e.g.,* Pls.' Ex. 281 (1986 draft of note to TSRT; "Brown and Williamson now believe that for legal reasons parts of the Group Research Programme are not acceptable. On the other hand BATCo believe that the Programme reflects a responsible commercial attitude which takes due account of legal obligations. B.A.T. Industries has been asked for a ruling."); Pls.' Ex. 36 at 2 (file note dated June 12, 1984 by B & W corporate counsel; noting difficulty of problem posed by BAT scientists and frequently used consultants who regarded causal link between smoking and disease as proven); Pls.' Ex. 43 at 1 (memorandum of February 17, 1986 from B & W corporate counsel to B & W general counsel; "The only way BAT can avoid having information useful to plaintiffs found at B & W is to obtain good legal counsel and cease producing information in

Canada, Germany, Brazil and other places that is helpful to plaintiffs.").

Of particular concern was the potential admissibility in suits against B & W of unfavorable smoking and health statements by BAT scientists. Also presenting a problem was the presence of BAT Group research reports in B & W's files. The record contains a series of internal B & W memoranda and file notes written during the 1970's and 80's by B & W's corporate counsel, Mr. J.K. Wells, on how to handle BAT scientific reports. The first of these is a memorandum to Mr. Pepples, who, as already noted, was then B & W's vice president and general counsel. In it Mr. Wells notes that he has not been able to improve upon Mr. Pepples' proposed method of handling BAT scientific materials: "The material should come to you under a policy statement between you and [BAT research and development in] Southampton which describes the purpose of developing the documents for B & W and sending them to you as use for defense of potential litigation." Pls.' Ex. 29 at 1. A subsequent memorandum from Mr. Wells to Mr. Pepples discusses various "alternatives for handling BAT scientific reports which come to B & W in a way that would afford some degree of protection against discovery." Pls.' Ex. 30. The author recommends a procedure whereby BAT scientific reports would be shipped for special handling directly to a Dr. Esterle, who would be designated as Mr. Pepples' "agent for the acquisition of scientific materials in anticipation of litigation." Pls.' Ex. 30 at 1. The memorandum continues:

> Regardless of the initial recipient of the documents, in order to be covered by the rules of civil procedure they must be "prepared in anticipation of litigation." Appropriate paper work should be established with BAT, including any amendments to the cost sharing agreement to establish that documents of a certain nature are prepared for B & W in anticipation of litigation. I have in mind paper work which would make this

statement as a policy between the parent and sibling . . . .

*Id.* at 1–2.

A 1985 "File Note" on "Document Retention" records a conversation between Mr. Wells' and B & W's vice president for research and development, Earl Kohnhorst. It discusses the removal of sensitive smoking and health information deemed "deadwood in the behavioral and biological studies area" from B & W's files. *See* Pls.' Ex. 38 at 1. Mr. Wells explained that documents marked with an "X" as well as "B" series documents relating to Project Janus (mouse skin painting experiments) should be considered deadwood, pulled from the files and stored in the basement for possible later shipment to BAT. *See id.* at 2. Mr. Wells then suggests that Mr. Kohnhorst tell his employees "that this was part of an effort to remove deadwood from the files and that neither he nor anyone else in the department should make any notes, memos or lists." *Id.* A 1986 memorandum documents a meeting between Mr. Wells and B & W research and development personnel regarding receipt of "BAT Science." The memorandum indicates that B & W had arranged to limit its receipt of BAT Group scientific reports to concise bi-annual summaries in connection with those specific projects it chose to follow in order to reduce the potential for receiving inculpatory information. *See* Pls.' Ex. 43 at 1.

BAT appears to have taken a number of specific measures in response to B & W's litigation predicament. Its adoption of the "genuine scientific controversy" stance as official policy for its subsidiaries has been described in detail. In addition, BAT created a detailed set of procedures for sending information and written materials to the United States. A 1985 document sets out these procedures. Research and development reports destined for countries other than the United States were to be routed through Group research and development headquarters, where a recipient list, which "must *not* contain the name of

any B & W person," would be compiled. *See* Pls.' Ex. 450 (emphasis in original). Research and development materials to be sent to the United States were to be addressed to a Robert L. Maddox, Jr. "The covering letter should simply say that BATCo Millbank has asked that he, Maddox, receive the documents." *Id.* These arrangements were in keeping with what was apparently a long history of vigilance over the exchange of sensitive scientific information between B & W and its English parent. *See, e.g.,* Pls.' Exs. 12–14 (correspondence between BAT and B & W from November and December 1968 addressing difficulties of exchange of smoking and health information). *See also* Pls.' Ex. 36 (file note of June 1984 recording a meeting between B & W and "BAT Legal" on United States product liability Litigation; "[I]t is fair to say that BAT Legal are informed about the danger of the admissibility of BAT statements on smoking and health in U.S. products liability litigation. BAT Legal will offer counsel to BAT activities which pertain to smoking and health . . . .").

Taken together, the above evidence reveals the dilemma created for B & W by decades of BAT Group research demonstrating the health hazards and addictiveness of smoking. B & W's attempt to solve its potential litigation discovery problems by controlling the flow of information into the United States and BAT's collaboration in this process are also reflected in the record.

G. BAT's Extensive Participation in the Marketing and in Research and Development of Cigarettes

The record contains evidence of BAT's involvement in numerous aspects of the marketing, research and development of BAT Group cigarettes. Through the membership of its Chairman, Deputy Chairman, and Finance Director on the TSRT, BAT actively participated in the research, development and marketing of cigarettes. The mandate of the TSRT, it will be recalled, was to formulate Group tobacco strategy and to ensure cooperation on all matters among BAT's tobacco operating companies. *See, e.g.,* Pls.' Ex 91 at ¶ 2 (minutes of October 1988 TSRT meeting). Some of the matters addressed by the TSRT, such as "Smoking Issues" and the use of nicotine-enhanced products and processes, have already been adverted to. Additional examples, culled from the minutes of TSRT meetings over the years, are marketing strategies to compete with Marlboro and Camel, *see, e.g.,* Pls.' Ex. 273 at ¶¶ 14–17; Pls.' Ex. 274 at ¶ 18; new nicotine delivery systems, *see, e.g.,* Pls.' Ex. 279 at ¶ 88; directions to be followed on the Barclay filter and the development of a new "ultra" filter to meet FTC requirements, *see, e.g.,* Pls.' Ex. 272 at ¶¶ 1–3; Pls.' Ex. 273 at ¶¶ 2, 4, 6; and initiatives to fight those viewed as anti-tobacco, *see, e.g.,* Pls.' Ex. 471 at ¶¶ 4, 7.

The specific and detailed input of BAT's Chairman is also evident from the minutes of these meetings. In addition to Mr. Sheehy's promotion of ammonia processing, Y–1 tobacco and the "Smoking Issues Compendium," already discussed, the record abounds with examples of the Chairman's intervention across the full spectrum of marketing and product development matters discussed at TSRT meetings. *See, e.g.,* Pls.' Ex. 274 at ¶ 9 (Chairman suggested immediate change in the rating printed on Barclay packets to reflect lower deliveries being achieved); *id.* at ¶ 29 (Chairman asked that companies test samples produced by plant utilizing new APEX process for tobacco expansion); Pls.' Ex. 277 at ¶ 7 (Chairman stated importance of positioning Barclay as a premium brand in a form where it could be promoted as a low delivery product); Pls.' Ex. 278 at ¶ 36 (Chairman emphasized need to achieve competitive or better quality with regard to Lucky Strikes, perhaps by using more imported leaf, and to reduce the price differential to Marlboro with the goal of being not more than one price point below Marlboro in all markets by the end of 1992); *id.* at ¶ 50 (Chairman asked that

further pressure be applied to solve problem of companies which were either below or above the agreed stock duration targets); Pls.' Ex. 96 at ¶ 17 (Chairman asked that BATCo and Souza Cruz give further consideration to adoption of the "sheet process"); id. at ¶ 20 (Chairman suggested that Souza Cruz should consider development of "low-sidestream" papers, possibly by producing an existing paper of this type under license); id. at ¶ 41 (Chairman asked for a specific program to re-launch Kent in Europe showing three years from 1991 and analysis of the costs and benefits of the program proposed). These documents suggest comprehensive involvement and intervention by BAT in the areas of marketing and research and development affecting New York's smokers.

## IV. NEW YORK STATUTORY BASES FOR JURISDICTION

■ In a diversity suit, personal jurisdiction is determined in accordance with the law of the forum state. *See, e.g., Cut-Co Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc). *But cf.* American Law Institute, *Complex Litigation: Statutory Recommendations and Analysis* § 3.08 cmt. b, at 150 (1994) (given that complex litigation "is by definition a national phenomenon ... it would be odd to allow the efficient resolution of complex diversity cases to depend on the reach of a particular state's long arm statute"). Plaintiffs assert personal jurisdiction under various provisions of New York's CPLR. They claim that BAT may be subjected to suit in New York on the basis of both systematic and continuous New York contacts, *see* N.Y. CPLR 301, and specific acts by BAT and by its agents and co-conspirators, *see* N.Y. CPLR 302(a)(1), (2), (3). The record contains overwhelming support for the exercise of jurisdiction over BAT based on the in-state tortious acts of its co-conspirators. *See* N.Y. CPLR 302(a)(2). These acts furnish the most obvious basis for subjecting BAT to suit in New York. *See*

Part IV.A, *infra*. Nevertheless, there are other possible grounds for finding that New York courts have personal jurisdiction. *See* Part IV.B, *infra*.

### A. Conspiracy Theory of Jurisdiction

#### 1. Law

■ New York's CPLR 302(a)(2) confers jurisdiction over a nondomiciliary who "in person or through an agent ... commits a tortious act within the state." To support the exercise of jurisdiction under this section, the act in question must be "purposeful," *Galgay v. Bulletin Co.*, 504 F.2d 1062, 1064 (2d Cir.1974), and there must be some "articulable nexus" between it and the claim asserted. *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981).

The term "agent" for purposes of CPLR 302(a)(2) has been read to include co-conspirators. *See, e.g., American Broad. Co. v. Hernreich*, 338 N.Y.S.2d 146, 148, 40 A.D.2d 800, 801 (1st Dep't 1972); *Cleft of the Rock Found. v. Wilson*, 992 F.Supp. 574, 581 (E.D.N.Y.1998); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1266 (S.D.N.Y.1991) (citing *Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798, 806–07 (S.D.N.Y.), *aff'd*, 527 F.2d 87 (2d Cir.1975)). "It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2)." *Chrysler Capital*, 778 F.Supp. at 1266 (closing of fraudulent sale-and-leaseback transaction in New York conferred jurisdiction over co-conspirator nonresident electric utility company); *see also Andre Emmerich Gallery, Inc. v. Segre*, No. 96 Civ. 889, 1997 WL 672009, at *5–6 (S.D.N.Y. Oct. 29, 1997) (non-domiciliary father subject to suit in New York on basis of fraudulent art sale carried out there by co-conspirator son); *Gudaitis v. Adomonis*, 643 F.Supp. 383, 385 (E.D.N.Y.1986) (co-conspirators' commission of tortious acts in New York con-

ferred jurisdiction over Massachusetts resident); *Dixon v. Mack,* 507 F.Supp. 345 (S.D.N.Y.1980) (abduction of cult adherent from New York conferred jurisdiction over Pennsylvania psychiatrist called in to "deprogram" him).

■ To establish jurisdiction over a nonresident defendant on the basis of the New York acts of a co-conspirator, the plaintiff must: (1) establish a prima facie case of conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate the commission of a tortious act in New York during, and pursuant to, the conspiracy. *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 782 F.Supp. 215, 221 (S.D.N.Y.1992); *Chrysler Capital,* 778 F.Supp. at 1266.

■ Under New York law a prima facie showing of a conspiracy entails allegation of the primary tort and the following four elements:

1. a corrupt agreement between two or more parties,

2. an overt act in furtherance of the agreement,

3. the parties' intentional participation in the furtherance of a plan or purpose, and

4. the resulting damage or injury.

*Chrysler Capital,* 778 F.Supp. at 1267 (citing *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986)).

■ The requisite relationship between the defendant and its New York co-conspirators is established by a showing that

(a) the defendant had an awareness of the effects in New York of its activity;

(b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and

(c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request or on behalf of' the out-of-state defendant.

*Chrysler Capital,* 778 F.Supp. at 1268–69 (quoting *Dixon,* 507 F.Supp. at 350).

2. Application of Law to Facts

First, it should be noted that New York state and federal courts have recognized the applicability of the conspiracy theory of jurisdiction to BAT in other tobacco litigations. In *Small v. Lorillard Tobacco Co.,* 672 N.Y.S.2d 601, 176 Misc.2d 413 (Sup.Ct.N.Y.Cty.1997), *vacated on other grounds,* 252 A.D.2d 1, 679 N.Y.S.2d 593 (1st Dep't 1998), *aff'd,* 94 N.Y.2d 43, 720 N.E.2d 892, 698 N.Y.S.2d 615 (1999), the court found sufficient support in the record to assert conspiracy-based jurisdiction over BAT. The appellate division approved in dictum, agreeing that plaintiffs had created an issue of fact as to whether BAT had instructed its subsidiaries to enhance the addictiveness of their products and to hide results of research on addiction. *See* 252 A.D.2d at 17, 679 N.Y.S.2d at 605. The major impact that BAT's actions could have had on the manner in which cigarettes were sold in New York, was deemed sufficient to substantially connect the conspiracy to the forum. *See id.*

In *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 26 F.Supp.2d 593, 601 (S.D.N.Y.1998), *vacated on other grounds,* 191 F.3d 229 (2d Cir.1999), the court recognized "significant support in the New York case law . . . for the exercise of jurisdiction based on conspiracy," *id.* at 601, but granted BAT's motion to dismiss on the ground that all of the plaintiffs' allegations of conspiracy concerned activities which took place before BAT's 1976 formation. Plaintiffs were granted leave to file an Amended Complaint to plead additional facts connecting BAT to the alleged conspiracy. *See id.* at 604.

Courts of a number of other jurisdictions have also exercised conspiracy-based jurisdiction over BAT. *See, e.g., Arkansas Blue Cross and Blue Shield v. Philip Morris, Inc.,* No. 98 C 2612, 1999 WL 202928 (N.D.Ill. March 31, 1999) (jurisdiction over BAT could be proper on a conspiracy theory); *Montana ex rel. Mazurek v. Philip Morris, Inc.,* No. CDV–97–306 slip op. at 8

(Mont. 1st Jud. Dist.Ct. Sept. 22, 1998) (sufficient showing of personal jurisdiction over BAT on basis of conspiracy); *Washington v. American Tobacco Co.*, No. 96-2-15056-8 SEA, slip op. at 10-12 (Wash.Super.Ct. June 9, 1998) (BAT's knowing and intentional participation in alleged tobacco industry conspiracy provided sufficient contacts with Washington to support exercise of jurisdiction); *Northwest Laborers-Employers Health & Security Trust Fund v. Philip Morris, Inc.*, No. C97-849WD, slip op. at 2 (W.D.Wash. May 13, 1998) (plaintiff established prima facie case of conspiracy-based personal jurisdiction); *Oklahoma v. R.J. Reynolds Tobacco Co.*, No. CJ-96-1499 (Okla.Dist. Ct. Dec. 8, 1997) (sufficient evidence that BAT was involved and participated in tobacco-related conspiracy to commit tortious acts to support exercise of jurisdiction).

Defendant contends that a parent and its subsidiary cannot civilly conspire. Even were this contention true, it would not affect BAT's jurisdictional status since, as already demonstrated, it also conspired with non-BAT Group entities comprising essentially the entire United States tobacco industry. In any event, research uncovers no rule in this circuit such as that defendant professes outside the special Sherman Act context. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (a parent and a wholly owned subsidiary could not conspire for purposes of section 1 of the Sherman Act); *see also Viacom Int'l Inc. v. Time Inc.*, 785 F.Supp. 371, 381 (S.D.N.Y.1992) (*Copperweld* requires "plurality of economic actors" to support allegations of conspiracy to monopolize under section two of the Sherman Act).

The policies animating the Sherman Act can be adequately vindicated by treating a multi-corporate entity as one body even though its component corporations perform separate actions intended in total to frustrate the Act; it is the cooperation of one entity with another distinct and unrelated one which is particularly threatening to the free market competition the Act was designed to protect. *See Copperweld*, 467 U.S. at 771, 104 S.Ct. 2731 ("If a parent and its wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.").

In the mass tort product liability area, by contrast, the dangers to be deterred can be created just as easily when two corporations that are part of the same entity cooperate to harm the public as when independent entities cooperate to the same end. As the case law of this circuit demonstrates, the component corporations of a single integrated entity may be considered separate and capable of conspiring with one another for some purposes, but not for others. *Compare, e.g., Aerotech, Inc. v. TCW Capital*, No. 93 Civ.1987, 1994 WL 775439, at *2 (S.D.N.Y. April 20, 1994) (parent and subsidiary incapable of combining or conspiring for purposes of sections 1 and 2 of the Sherman Act) *with Rouse v. Rouse*, No. 89 CV 597, 1990 WL 160194, at *14 (N.D.N.Y. Oct. 17, 1990) ("the mere fact that an alleged RICO conspiracy is intracorporate does not mean that the alleged RICO conspiracy fails as a matter of law") *and Supra USA Inc. v. Samsung Electronics Co.*, No. 85 Civ. 9696, 1987 WL 19953, at *7 (S.D.N.Y. Nov. 10, 1987) (*Copperweld* doctrine does not apply · to suits under Robinson–Patman Act), *see also Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir.1989) (recognizing intracorporate RICO conspiracy); *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1167 (3d Cir.1989) (same); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123, 1135 (D.N.J.1989) (recognizing "intra-corporate conspiracies is more faithful to the broad purposes of RICO than a narrow reading which is modeled on antitrust law").

The nature of the danger determines the policy and its implementation by way of

specific substantive and jurisdictional rules. While the goals of the Sherman Act may not be sufficiently threatened by parent-subsidiary conspiracies to warrant its applicability to such cases, the same cannot be said of the policies embodied in New York's substantive tort and jurisdictional law. The hub in this case may be said to have conspired with the integrated spokes and rim as well as with other independent wheels.

a. Prima Facie Showing of Conspiracy

■ Plaintiffs have alleged the primary tort of fraudulent concealment. Its elements are material false representation, intent to defraud, reasonable reliance, damages and a duty to disclose on the part of the misrepresenting party. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat' Bank*, 57 F.3d 146, 153 (2d Cir.1995). The tobacco industry's repeated assertions that a causal link between smoking and disease had not been established were, plaintiffs contend, material, false and made with the intent to defraud and conceal from them research data confirming the health risks of cigarettes. Plaintiffs further allege that their reliance on these misrepresentations was reasonable in view of the industry's (including BAT's as a leading member) superior resources and knowledge and its public promise to fund and disseminate the results of objective smoking and health research. These same factors, it is plausibly argued, also gave rise to a duty on the part of the industry, including BAT, to disclose all relevant information. Plaintiffs claim to have suffered substantial personal injuries and damages as a result of this alleged fraud.

■ A corrupt agreement, the first element of a conspiracy, may be readily inferred from the tobacco companies' formation of and membership in CTR. The 1953 "Frank Statement to Cigarette Smokers" signed by, among others, the American Tobacco Company, B & W, Philip Morris, and R.J. Reynolds, informed the American people that out of its concern for their welfare, the tobacco industry would provide "aid and assistance to the research effort into all phases of tobacco use and health." Pls.' Ex. 1. Yet, as revealed by the documents, CTR's actual purpose was to place the industry in a positive light while at the same time generating research for use in supporting its deceptive position that the health hazards of smoking were unproven.

The remaining elements of a conspiracy are also satisfied. There is evidence of multiple overt acts by the tobacco companies in furtherance of the alleged conspiracy both in and outside of New York. New York acts include the formation of CTR and the covert distribution of funds through CTR "special projects" and "special account 4." *See, e.g.*, 2004.29, 2034.01–02, 2034.06, 2015.02, 2024.02. These acts also satisfy the requirement of the commission of a tortious act in New York.

Another example of an overt New York act is the publication of the Barron's advertisement. As already pointed out, the editorial denied proof that smoking was dangerous and characterized the evidence to the contrary as part of a regulatory "crusade" by "witch doctors" and "medicine men." *See* Glantz, *supra*, at 177; *see also* Doc. No. 2101.06 (letter from B & W's vice president for advertising characterizing the Barron's campaign as a "step forward together" by the industry). The Barron's advertisement was prepared by Tiderock Corporation, a New York advertising agency, *see* Glantz, *supra*, at 175, and was available to New York readers.

The overt acts enumerated above also support an inference of intentional participation in furtherance of a plan or purpose. *See, e.g., Cleft of the Rock*, 992 F.Supp. at 582.

The proposed plaintiff class is composed of individuals who smoked one package of cigarettes or more per day over a twenty-year period. Their claims to have developed lung cancer as a result of the tobacco

industry's conduct satisfy the final element of a prima facie case of conspiracy.

It should be emphasized that a determination that sufficient color of a conspiracy exists for jurisdictional purposes does not control the issue of whether plaintiffs will ultimately adduce sufficient evidence to prevail on the merits of their conspiracy claim at trial.

b. BAT's Relationship to the Tobacco Conspiracy and the New York Acts of its Co–Conspirators

The record is replete with evidence of what arguably were tortious acts by BAT in furtherance of the tobacco industry conspiracy. *See, e.g.,* Pls.' Ex. 40 (BAT's 1984 "Legal Considerations" memorandum imposing a "genuine scientific controversy" stance with respect to smoking and health on its subsidiaries); Pls.' Ex. 66 (BAT's 1993 reassertion of this policy); Pls.' Ex. 276 (1988 letter from BAT's Chairman to Canadian affiliate stating that it could not support development of a safe cigarette since this would imply the view that cigarettes are dangerous); Pls.' Ex. 36 (1984 file note documenting meeting between B & W and "BAT Legal" on product liability litigation in the United States; "BAT Legal will offer counsel to BAT activities which pertain to smoking and health."); Pls.' Ex. 450 (January 1985 memorandum describing special stealthy procedure for distributing BAT smoking and health documents to B & W).

These acts continued a long standing strategy of hiding inculpatory BAT Group research data from the American public in order to safeguard BAT's United States business interests. *See, e.g.,* Pls.' Ex. 6 (BATCo's 1963 decision not to disclose results of nicotine research to United States Surgeon General's Advisory Committee on Smoking and Health); Pls.' Ex. 13 (1968 letter from BATCo informing B & W general counsel that certain information "can be made known in confidence to the rest of your Group in the U.S. Industry, if you so wish," but noting that it "would not ... wish the source of this information dis-closed—although admittedly it would not be very difficult for others in your Group to guess this."). BAT's knowledge of and access to over thirty years of detailed information on the health hazards of smoking, makes its coverup actions, if proven, particularly egregious.

Awareness on the part of BAT of the effects of its acts in New York may be inferred. BAT's concealment of information and enforcement of a code of silence on its subsidiaries were undertaken to protect its American subsidiary, B & W. To accomplish this it knowingly supported the efforts of the United States tobacco industry as a whole to make cigarette smoking palatable to the American regulatory authorities and smokers and potential smokers around the country, including New York, by suppressing what it knew about the dangerousness of cigarettes.

Many of the tortious New York acts of BAT's co-conspirators were committed subsequent to BAT's formation in 1976. Earlier activities were ratified by BAT when it joined the conspiracy. *See Cleft of the Rock,* 992 F.Supp. at 584 (New York acts of co-conspirators are a proper basis of personal jurisdiction even where defendant may have joined alleged conspiracy after overt New York acts were committed since " 'joining of the conspiracy, adoption of its goals, and action in furtherance of it ... constituted a ratification of those acts already committed with the purpose of accomplishing the same goal.' " (quoting *Dixon v. Mack,* 507 F.Supp. 345, 350 (S.D.N.Y. 1980))). New York acts were committed on behalf of and for the benefit of all participants in the United States tobacco industry, including BAT. That BAT did intend to, and did in fact benefit from these New York activities is adequately supported by the evidence.

In sum, plaintiffs have met the requirements for the exercise of conspiracy-based personal jurisdiction over BAT.

CPLR 302(a)(2), it will be recalled, confers jurisdiction "[a]s to a cause of action

arising from ... [the] commi[ssion of] a tortious act within the state." Nothing in this language either expressly or impliedly excludes claims connected to injuries incurred outside the state. The focus of the section is on the locus of the act not that of the resulting injury. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 28–29 (2d Cir.1997). Its aim is to subject to the personal jurisdiction of the New York courts those non-resident defendants who engage in tortious conduct in the state. *See id.; see also Feathers v. McLucas*, 15 N.Y.2d 443, 460, 209 N.E.2d 68, 77, 261 N.Y.S.2d 8, 21 (1965) (purpose of section 302's draftsmen was "to subject non-residents to personal jurisdiction when they commit acts within the state" (citation and internal quotation marks omitted)). The claims of all proposed class members may be said, at least in part, to "arise from" tortious acts committed in New York. Thus, all of the plaintiffs—whether resident in or outside New York—may rely on CPLR 302(a)(2).

### B. Other Theories of Personal Jurisdiction

Because the case for conspiracy jurisdiction is so strong, detailed consideration of plaintiffs' other theories supporting the exercise of personal jurisdiction is unnecessary. It bears noting, however, that jurisdiction may also be appropriate under CPLR 301 and 302(a)(3)(ii).

### 1. CPLR 302(a)(3)(ii)

CPLR 302(a)(3)(ii) provides for personal jurisdiction over a nondomiciliary who commits an out-of-state tortious act causing in-state injury in a case arising out of that act, provided that the nondomiciliary "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...." The exercise of jurisdiction under this section requires a showing that (1) the defendant committed a tortious act outside of New York, (2) this act caused injury in New York to a person or property, (3) defendant reasonably should have expected this act to have New York consequences, and (4) defendant earns substantial revenue from interstate or international commerce. *See Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 325, 425 N.Y.S.2d 783, 786, 402 N.E.2d 122, 125 (1980). Each of these elements has been established.

For purposes of the instant case, each plaintiff's injury may be deemed to have occurred in the state where his or her damages were felt. *See In re DES Cases*, 789 F.Supp. 552, 570 (E.D.N.Y.1992) (since there was no realistic risk of New York DES plaintiffs' having brought their injuries to New York in order to litigate them here, the place of the injury was New York); *see also Benson v. Syntex Lab., Inc.*, 161 Misc.2d 822, 827, 614 N.Y.S.2d 990, 994 (Sup.Ct. Chatauqua Cty.1994) (where defective baby formula was manufactured out of state, but ingested in New York, place of injury was New York not the place of manufacture), *aff'd*, 227 A.D.2d 1008, 643 N.Y.S.2d 298 (4th Dep't 1996); *Hamilton v. Garlock, Inc.*, No. 94 Civ. 4397, 1999 WL 135203, at *5 (S.D.N.Y. Mar. 11, 1999) (plaintiff who was exposed to asbestos in Virginia and developed and died of mesothelioma in New York decades later suffered a New York injury), *rev'd on other grounds sub nom. Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58 (2d Cir.1999); *Penny v. United Fruit Co.*, 869 F.Supp. 122, 127–28 (E.D.N.Y.1994) (exposure to asbestos at sea deemed to have caused injury in New York where plaintiff became a citizen years before he became ill since "his presence in New York could hardly be deemed transitory or motivated by a desire to better his chances in litigation.").

Those plaintiffs who cannot independently meet the "injury in New York" requirement may rely on the factual and jurisdictional links of proposed class members who were injured here. The New York class members may be considered the jurisdictional representatives of the en-

tire nationwide class in much the same way as the named plaintiffs are its citizenship representatives for purposes of determining diversity competence of the federal court. *Cf. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (New Hampshire courts could exercise personal jurisdiction over defendant in multistate libel action even though only a small percentage of national injuries occurred in that state); Diane P. Wood, *Adjudicatory Jurisdiction and Class Actions*, 62 Ind. L.J. 597, 616–18 (1987) (discussing conditions under which specific jurisdiction with respect to some individuals' claims may be parlayed into jurisdiction of claims of the entire class).

2. CPLR 301

Jurisdiction theory and practice, like other areas of the law, evolve to meet political, economic, social, and technological changes. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Hamilton v. Accu–Tek*, 32 F.Supp.2d 47 (E.D.N.Y. 1998); *In re DES Cases*, 789 F.Supp. 552 (E.D.N.Y.1992); *Bulova Watch Co. v. K. Hattori*, 508 F.Supp. 1322 (E.D.N.Y.1981); *see also* Harold L. Korn, *Rethinking Personal Jurisdiction and Choice of Law in Multistate Mass Torts*, 97 Colum.L.Rev. 2183 (1997); Harold L. Korn, *The Development of Judicial Jurisdiction in the United States*, Part I, 65 Brook.L.Rev. (1999); *cf. Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 1977, 144 L.Ed.2d 319 (1999) (Ginsburg, J., dissenting) ("A dynamic equity jurisprudence is of special importance in the commercial law context. As we observed more than a century ago: 'It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them.'" (quoting *Union Pacific R. Co. v. Chicago R.I. & P.R. Co.*, 163 U.S. 564, 600–01, 16 S.Ct. 1173, 41 L.Ed. 265 (1896))). *But cf.* American Law Institute, *International Jurisdiction and Judgements Project* 6 (Memorandum No. 1, Oct. 28, 1999) (United States would be required to limit jurisdiction under current Hague Conference proposals for an International Convention on Jurisdiction and the Recognition of Foreign Judgments)

The common law and equitable continuing development of traditional jurisdictional bases argue in support of the exercise of jurisdiction pursuant to CPLR 301. This provision permits the court to exercise "such jurisdiction ... *as might have been exercised heretofore.*" (emphasis added). In considering the meaning of the CPLR, "the drafters' stated 'objectives' are well worth consideration." Harold L. Korn et al., *New York Civil Practice* ¶ 301.06 (1995). Chief among these were "[t]o make it possible, with very limited exceptions, for a litigant in the New York courts to take full advantage of the state's constitutional power over persons." *Id.* Limitations in CPLR 302 did not change that primary thrust. As commentators have pointed out:

> The word "might" in CPLR 301 is properly construed to cover the principles applicable to any line of New York cases, even if no prior court had previously dealt with the precise situation at hand. It permits the courts to develop prior concepts used in New York without the limitations of statutory language.

Korn et al., *supra,* ¶ 301.10.

One relevant well accepted concept strongly favoring the exercise of jurisdiction under CPLR 301 is basic fairness of the forum choice as between plaintiff and defendant. *See, e.g., Hutchinson v. Chase & Gilbert*, 45 F.2d 139, 142 (2d Cir.1930) (Learned Hand, J.) (relevant question is whether it is fairer for defendants to come to New York or for plaintiffs to go to Massachusetts). Another recognizable relevant factor would be the interest of New York in reducing transaction costs to its residents in mass tort cases by bringing together in one case all related New York

and non-New York plaintiffs and all defendants necessary to the fair disposition of the litigation.

## V. DUE PROCESS

### A. Law

 The Due Process Clause of the Fourteenth Amendment has been interpreted as limiting state courts' power to exercise personal jurisdiction over nonresident defendants. *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 412–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). *But see* Korn, *supra,* 65 Brook.L.Rev. (historical and current developments requiring rejection of limitations instituted by *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877)). One statement of the current due process test for personal jurisdiction requires considerations of two elements. The first prong of the inquiry—the "minimum contacts" prong—has been described as a "fair warning" requirement. *See Burger King,* 471 U.S. at 472, 105 S.Ct. 2174. It "focuses on 'the relationship among the defendant, the forum and the litigation.'" *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Where the "general" jurisdiction of the court is invoked, the plaintiff must establish the defendant's "continuous and systematic general business contacts with the forum." *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. Where "specific" jurisdiction is asserted, the "minimum contacts" requirement is satisfied by a showing that the defendant 'purposefully directed' his activities at forum residents and that the suit arises out of those activities. *See Burger King,* 471 U.S. at 472, 105 S.Ct. 2174. The Supreme Court has reasoned:

> By requiring that individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign, the Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

*Id.* (citations and internal quotation marks omitted).

The second phase of the due process inquiry assesses the reasonableness of exercising jurisdiction once "minimum contacts" have been established. *See id.* at 476–77, 105 S.Ct. 2174.

The strengths of the showings required to satisfy the "minimum contacts" and "reasonableness" prongs are inversely related. The more reasonable the assertion of jurisdiction, the weaker the defendant-forum links necessary support it. *See id.* at 477, 105 S.Ct. 2174 ("considerations [of reasonableness] sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required"). By the same token, where activities have been purposefully directed toward state residents, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477, 105 S.Ct. 2174. *See also Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996) ("depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry"); *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994) ("[T]he weaker the plaintiff's [minimum contacts] showing, the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline [minimum contacts] showing.").

1. Minimum Contacts

a. Membership in a Conspiracy

 Whether the forum contacts of an in-state actor may be attributed to an out-of-state co-conspirator for due process purposes or whether the latter must independently satisfy the "minimum contacts" requirement is open to question. While some New York courts have taken the latter approach, *see, e.g., Small v. Lorillard Tobacco Co.,* 176 Misc.2d 413, 672 N.Y.S.2d 601, 608 (Sup.Ct.N.Y.Cty.1997); *Cleft of the Rock Found. v. Wilson,* 992 F.Supp. 574, 584–85 (E.D.N.Y.1998); *Andre Emmerich Gallery, Inc. v. Segre,* No. 96 Civ. 889, 1997 WL 672009, at \*6; *Dixon v. Mack,* 507 F.Supp. 345, 352 (S.D.N.Y. 1980), others have dispensed with the due process inquiry where conspiracy-based jurisdiction is asserted. *See, e.g., American Broad. Co. v. Hernreich,* 338 N.Y.S.2d 146, 40 A.D.2d 800 (1st Dep't 1972); *Hade v. Kott,* No. 91 Civ. 5897, U.S. Dist. LEXIS 274 (S.D.N.Y. Mar. 8, 1993); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 782 F.Supp. 215 (S.D.N.Y.1992), *aff'd,* 994 F.2d 996 (2d Cir.1993); *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260 (S.D.N.Y.1991); *Gudaitis v. Adomonis,* 643 F.Supp. 383 (E.D.N.Y.1986). The attributional view has been criticized by a number of commentators. *See, e.g.,* Thomas J. Leach, *Civil Conspiracy: What's the Use?,* 54 U. Miami L.Rev. 1, 14–15 (1999) (if extraterritorial defendant's forum contacts do not satisfy due process then the conspiracy cannot confer personal jurisdiction); Stuart M. Riback, Note, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,* 84 Colum. L.Rev. 506, 529 (1984) (conspiracy theory is not consistent with due process in all cases); Ann Althouse, *The Use of Conspiracy Theory to Establish in Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L.Rev. 234, 252 (1983) ("a court may not simply take the principle of state law that a co-conspirator acts as the agent of the other conspirators, plug it into the state's jurisdiction statute, and exercise whatever purported jurisdiction flows from that combination"). Yet, as one court of appeals has noted, it is not clear why personal jurisdiction should be an exception to the general rule of attributing the acts of one conspirator within the scope of the conspiracy to the other conspirators. *See Stauffacher v. Bennett,* 969 F.2d 455, 459 (7th Cir.1992). Which is the correct view need not be decided here since BAT's New York contacts far surpass any due process requirements.

"Minimum contacts," as already pointed out, are established by showing that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The analysis of those New York courts that have addressed the constitutionality of conspiracy jurisdiction has centered on the defendant's awareness of the commission of acts pursuant to the conspiracy in New York. One case for example, involved a fraudulent art sale consummated in New York by the out-of-state defendant's son. *See Andre Emmerich Gallery,* 1997 WL 672009. The court held that the father's participation in the alleged conspiracy knowing that a forgery would be sold to a New York art dealer, thus affecting the New York art market, created enough of a forum connection to satisfy due process. *See id.,* at \*6.

New York acts occurring prior to the defendant's having joined the conspiracy may also provide a sufficient link to the state. *See, e.g., Dixon,* 507 F.Supp. at 352; *Cleft of the Rock,* 992 F.Supp. at 584–85. *Dixon* involved the abduction of a cult adherent from New York by his family and their subsequent out-of-state efforts to "deprogram" him. These efforts included consultation with a Pennsylvania psychiatrist who was ultimately named as a defendant in the resulting suit. The court held the exercise of jurisdiction over the psychiatrist constitutional because he had joined the alleged conspiracy knowing that the

plaintiff had been abducted in New York. This knowledge supported the conclusion that the defendant had purposely availed himself of the privilege of acting in New York such that he should reasonably have expected being subjected to suit here. *See id.; see also Cleft of the Rock,* 992 F.Supp. at 584–85 (joining conspiracy knowing that acts in furtherance of it had been committed in New York established "minimum contacts").

b. Intentional Tortious Acts Aimed at the Forum

Jurisdiction based on the in-state effects of intentional out-of-state forum-directed conduct was held to be consistent with the requirements of the Due Process Clause in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In *Calder,* a professional performer who lived and worked in California brought suit in connection with a National Enquirer article alleging libel, invasion of privacy and intentional infliction of emotional distress. The National Enquirer is a Florida corporation with its principle place of business in Florida, where the article in question was written and edited. Petitioners, the writer and editor of the article, argued that its foreseeable circulation in California, a process in which they had no input and over which they had no control, was an insufficient basis for the exercise of personal jurisdiction. Their situation, they argued, was like that of a hypothetical welder who works on a boiler in Florida which then explodes in California. *Id.* at 789, 104 S.Ct. 1482. The Court disagreed, distinguishing for purposes of the minimum contacts analysis, between "mere untargeted negligence" and "intentional, and allegedly tortious, actions ... expressly aimed at California." Where defendants engaged in intentional misconduct in Florida knowing that this would cause serious harm in California, jurisdiction in California was proper "based on the 'effects' of [petitioners'] Florida conduct in California." *Id.* at 789, 104 S.Ct. 1482.

Jurisdiction under *Calder's* "effects" test is not limited to the libel context in which it originated. The doctrine has been applied in a variety of cases involving deliberate wrongdoing. *See, e.g., Maggos v. Helm,* No. 98–15751, 1999 WL 402448, at *2 (9th Cir. June 11, 1999) (though causes of action was labeled "professional negligence" and "breach of duty," allegations of intentional misrepresentation and concealment triggered applicability of "effects" test); *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998) (applying "effects" test in case of trademark infringement and unfair competition that, because the purposeful conduct of the defendant was "akin to a tort case"); *Dakota Indus. Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1391 (8th Cir.1991) ("effects" test applied to case which "[l]ike *Calder* ... involve[d] intentional tortious wrongdoing—namely, the use of the trademark with knowledge of the infringement"); *see also Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 23–24 (2d Cir.1988) (in case asserting fraud, RICO and other claims, *Calder* supported the constitutionality of jurisdiction over defendants who "reached into" New York by misrepresenting the financial state of a franchisor in order to benefit from selling franchises to be operated in the state). A number of courts in other tobacco litigation have exercised personal jurisdiction over BAT on a *Calder* theory. *See, e.g., Cole v. Tobacco Inst.,* 47 F.Supp.2d 812, 815–16 (E.D.Tex.1999); *Washington v. American Tobacco Co.,* No. 96–2–15056–8 SEA (Wash.Super.Ct. June 9, 1998); *Massachusetts v. Philip Morris, Inc.,* No. Civ. 95–7378–J (Mass Super.Ct. Mar. 20, 1998).

2. Reasonableness

Once it is determined that minimum contacts exist, the reasonableness of exercising jurisdiction must be assessed. Five factors enter into the analysis:

(1) the burden on the defendant;

(2) the interest of the forum state in adjudicating the controversy;

(3) the interest of the plaintiff in obtaining convenient and effective relief;

(4) the interest of the interstate judicial system in obtaining the most efficient resolution of the dispute; and

(5) the shared interest of the states in furthering fundamental social policies.

*See Asahi*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *see also Burger King*, 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Where personal jurisdiction is sought over an alien defendant, consideration of "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the [state] court," substitutes for the final two factors, and "the Federal interest in Government's foreign relations polices" also may be a factor. *Asahi*, 480 U.S. at 115, 107 S.Ct. 1026.

### 3. Adaptation of Due Process to Mass Tort Context

The New York Civil Practice Law and Rules and the Federal Rules of Civil Procedure require that both state and federal jurisdictional provisions be construed to promote fairness and litigation efficiencies. *See, e.g.*, CPLR 104 ("The civil practice law and rules shall be liberally construed to secure the just, speedy and inexpensive determination of every civil proceeding."); CPLR 301, 302 (jurisdictional bases); Fed. R.Civ.P. 1 (the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action"); Fed.R.Civ.P. 4(k)(1)(A) (providing for "jurisdiction over the person of a defendant ... who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located"). These goals are impeded in multistate mass tort litigation by continued reliance on a defendant-forum territorial nexus as a precondition for the exercise of personal jurisdiction. *See generally In re DES Cases*, 789 F.Supp. 552, 574–577 (E.D.N.Y.1992); *see also* American Law Institute, *Complex Litigation: Statutory Recommendations and Analysis* § 3.08 cmt. b, at 151 (1994) ("ALI, Complex Litigation") (the "minimum contacts" requirement "act[s] as an impediment to achieving the most efficient consolidation of complex cases"); Korn, *supra*, 65 Brook.L.Rev. A more workable test is needed. *Cf., e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("minimum contacts" not required to bind absent members of plaintiff class so long as they were provided with "minimal procedural due process protections" consisting of "best practicable notice," a right to opt out and a showing of adequate representation by named plaintiffs).

Recognition of the unique jurisdictional challenges posed by mass litigations has led the American Law Institute to propose adoption of a national-contacts personal jurisdiction standard for complex litigation. *See* ALI, Complex Litigation § 3.08; *see also id.* cmt. e (likely constitutionality of "a federal national-contacts long-arm statute for use in complex cases"); Thomas D. Rowe, Jr., *Beyond the Class Action Rule: An Inventory of Statutory Possibilities to Improve the Federal Class Action*, 71 N.Y.U. L.Rev. 186, 201 (1996) (same). Adoption of the ALI's proposal would doubtless present a significant improvement since it would enlarge the size of the forum by reference to which "minimum contacts" are assessed. But the retention of a territorial nexus requirement—even where the relevant territory is the entire country—would still permit foreign defendants to organize their affairs in such a way as to avoid jurisdiction in the United States even where federal interest in a dispute is great, and subjecting the defendant to suit here would not be unduly burdensome. Adaptation of existing precedent is required if the jurisdictional obstacles preventing the effective adjudica-

tion of multistate or multination mass torts are to be overcome.

The idea of defendant-forum contacts as a jurisdictional prerequisite was developed in *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), which held that state courts could exercise personal jurisdiction only over those defendants who either consented to jurisdiction or were present in the state. This restrictive view was justified as a necessary accommodation of, and check upon, the sovereignty interests of the several states. *See id.* at 722. The limitation was held to be required by the Due Process Clause of the Fourteenth Amendment. *See id.* at 733. *But see* Korn, *supra*, 65 Brook.L.Rev.; Korn, *supra*, 97 Colum.L.Rev. 2183; Patrick J. Borchers, *The Death of the Constitutional Law of Personal Jurisdiction: From Pennoyer to Burnham and Back Again*, 24 U.C. Davis L.Rev. 19, 38–43 (1990).

The doctrinal twists and turns necessitated by such a rigid conception of due process limits on personal jurisdiction culminated in the somewhat relaxed "minimum contacts" formulation of *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'") (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The *International Shoe* Court grounded its due process test on considerations of both fairness and state sovereignty, *see id.* at 317, 66 S.Ct. 154 (the requirements of due process "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there"). This dual justification also finds expression in subsequent Supreme Court cases. *See,*

*e.g., World–Wide Volkswagen*, 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), (characterizing the Due Process Clause as an "instrument of interstate federalism [that] may sometimes act to divest the State of its power to render a valid judgment" even where other factors weigh strongly in favor of the exercise of jurisdiction); *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) ("[Due process] restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective states.").

More recent Supreme Court cases appear to reject sovereignty concerns as a justification for due process limits on personal jurisdiction, positing the protection of individual liberty interests as their primary rationale. In *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, for example, the Court stated:

> The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.

456 U.S. 694, 702–03, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The Court stated that restrictions on state sovereignty described in earlier cases as an independent justification for jurisdictional limits

> must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected.

*Id.* at 702 n.10, 102 S.Ct. 2099; *see also Burger King,* 471 U.S. at 471–72 & n. 13, 105 S.Ct. 2174 (jurisdictional due process protections serve to safeguard the liberty interests of the individual, rather than those of federalism); *Metropolitan Life,* 84 F.3d at 567 ("due process requirement for personal jurisdiction ... protects a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction"). Nevertheless, sovereignty concerns have continued up to now to factor into the due process inquiry via the "state interest" component of the reasonableness analysis. *See, e.g., Asahi,* 480 U.S. at 113–114, 107 S.Ct. 1026; *see also In re DES Cases,* 789 F.Supp. at 584 ("in [the sovereignty] context ... the inquiry has shifted from a territorial to an interest nexus analysis").

When jurisdictional due process is analyzed in terms of the liberty interests of absent defendants, retention of a defendant-forum territorial nexus as a jurisdictional prerequisite becomes difficult to justify. To the extent that individual liberty interests are protected by fair warning of possible assertions of jurisdiction, it is the forum state's jurisdictional law interpreted in light of the Due Process Clause, rather than defendant-forum contacts, which provides notice that a defendant should reasonably anticipate defending a suit in that state. *See In re DES Cases,* 789 F.Supp. at 571 and articles cited therein.

To the extent that the imposition of an undue burden on out-of-state defendants is a concern, it must be appreciated that defendant-forum contacts are a notoriously weak indicator of the inconvenience of being forced to litigate in a foreign forum. *See id.* at 585. The inadequacy of purely geographically based protections of absent defendants is particularly apparent in the modern information age, in which technological developments have dramatically decreased the difficulties of long distance litigation. *See, e.g., World–Wide Volkswagen,* 444 U.S. at 292–93, 100 S.Ct. 559; *Metropolitan Life,* 84 F.3d at 574; *see also*

Note, *Mass Tort Jurisdiction and Choice of Law in a Multinational World Communicating by Extra–Terrestrial Satellites,* 37 Willamette L.Rev. (2000). In mass cases, defendant-forum contacts are even less relevant to the question of a defendant's burden and inconvenience. Limitations on the scope of discovery required by Federal Rule of Civil Procedure 26(b)(2)(iii), the use of local counsel, and collaboration among defendants significantly reduce the cost of defending these litigations. *See id.* at 586.

A modified due process standard for mass torts was explicated in *In re DES Cases.* It replaced territorial contacts with state interest as the constitutional touchstone of in personam jurisdiction and limited the second step of the inquiry to a hardship assessment:

I. The court must first determine if the forum state has an appreciable interest in the litigation, i.e., whether the litigation raises serious issues whose resolution would be affected by, or have a probable impact on the vindication of, policies expressed in the substantive, procedural or remedial laws of the forum. If there is an appreciable state interest, the assertion of jurisdiction is prima facie constitutional.

II. Once a prima facie case is made, the assertion of jurisdiction will be considered constitutional unless, given the actual circumstances of the case, the defendant is unable to mount a defense in the forum state without suffering relatively substantial hardship.

Evidence to be considered in determining the defendant's relative hardship includes, inter alia, (1) the defendant's available assets; (2) whether the defendant has or is engaged in substantial interstate commerce; (3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; (4) the comparative hardship defendant will incur in defending the suit in another forum; and (5) the compara-

tive hardship to the plaintiff if the case were dismissed or transferred for lack of jurisdiction.

*Id.* at 587; *see also Hamilton v. Accu–Tek,* 32 F.Supp.2d 47, 50–53 (E.D.N.Y.1998) (applying modified due process standard in handgun litigation). The constitutionality of exercising jurisdiction over BAT in this mass tobacco litigation may also be analyzed under this standard.

### B. Application of Law to Facts

Lack of foreseeability or territorial nexus are not useful arguments that BAT can rely upon to resist personal jurisdiction. If the law holds, as it does here, that certain activities, wherever conducted, subject the doer to jurisdiction, then committing those acts makes amenability to jurisdiction foreseeable. The reasonableness of asserting jurisdiction is defined in terms of the hardship to the prospective defendant, the needs of the plaintiffs and the interests of the forum in complete and efficient adjudication. Other factors include the interests of other nations in international commerce and comity. In this case the facts all point to forum personal jurisdiction over BAT.

### 1. Minimum Contacts

The evidence of BAT's contacts with New York is more than sufficient to support the exercise of personal jurisdiction. When BAT joined the alleged tobacco industry conspiracy it either knew or should have known that substantial acts in furtherance had already occurred in New York and that more were likely to take place. Since a number of the large tobacco companies and the CTR were headquartered in the state, additional New York conspiratorial conduct was foreseeable. Jurisdiction may be asserted in connection with the claims of the entire proposed class since each plaintiff's claim in some sense "arises out of or relates to" the New York acts of BAT's co-conspirators. *See Helicopteros Nacionales de Colombia, S.A.*

*v. Hall,* 466 U.S. 408, 414 & n.8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

The requirement of "minimum contacts" is also satisfied by the New York effects of what could be construed as intentional and purposeful acts by BAT in furtherance of the alleged conspiracy to mislead and addict the plaintiffs. That BAT trained its sights on a larger, more diffuse target—smokers and their families in all fifty states as opposed to only one— does not render the "effects" test inapplicable. *Calder's* reasoning does not hinge on the fact that only one plaintiff living in only one state was involved. The main point of the case is its distinction between intentional and negligent wrongdoing for purposes of assessing minimum contacts. *See, e.g., Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d at 1390 (defendant's lack of control over distribution of product in forum state might militate against exercise of jurisdiction in a negligence action, but will not prevent jurisdiction when plaintiff has alleged an intentional tort); *Maggos v. Helm,* 1999 WL 402448, at *2 (applying "effects" test in case in which causes of action were labeled "negligence" and "breach of duty" but contained allegations of intentional misrepresentations and concealments). Where intentional misconduct is at issue, the wrongdoer should reasonably anticipate being called to answer for its conduct wherever the results of that conduct are felt. *See, e.g., Cole,* 47 F.Supp.2d at 815–816 (rejecting BAT's argument that *Calder* does not apply where intentional wrongdoing was aimed at more than one state); *Massachusetts v. Philip Morris, Inc.,* slip op. at 15 ("the fact that B.A.T. Industries p.l.c. aimed its alleged wrongdoing at the entire United States gives it the requisite 'minimum contacts' with each state where [it] caused injury").

BAT is alleged to have directed identical deliberate tortious conduct at the residents of every state in the union. In doing so, it participated in the creation of a general nationwide population of addicted smokers

whose claims are, in that sense, all related to each other and to the conduct directed at each of them in their home states and all other states. Thus personal jurisdiction over BAT extends to cover all of the plaintiffs' claims since all may be said to "arise out of or relate to" BAT's contacts with New York. Even if this were not so, the jurisdictional links of those plaintiffs injured in New York are sufficient, as already pointed out, to support jurisdiction in connection with the claims of the remainder of the proposed class. *See* Part IV.B.1, *supra.* Once jurisdiction over part of the case and the defendant is acquired by a state, it is up to that state, not the defendant, to decide how much of the total controversy affecting other states and residents of other states it will try in one litigation. From the point of view of prospective litigants and the world at large, the United States court system is an integrated and cooperative entity. That the reality often does not measure up to that perception cannot be used as an excuse for a defendant's utilization of jurisdiction theory to manipulate itself out of an effective litigation process in a state which appropriately entertains jurisdiction over the subject matter and the person.

Finally, it should be noted that BAT, through its substantial contribution to the marketing, research and development of its subsidiaries' products may be considered a de facto designer of cigarettes. As such, jurisdiction may be exercised over it on a stream of commerce theory. *See Asahi,* 480 U.S. at 122, 107 S.Ct. 1026 (listing "designing a product for th[e] state's market" as an example of "additional conduct" beyond placement of products into the stream of commerce that could satisfy "minimum contacts"); *see also Cole v. Tobacco Inst.,* 47 F.Supp.2d 812, 815 (E.D.Tex.1999) (applying stream of commerce theory to BAT on basis of its participation in cigarette research and design); *Wessinger v. Vetter Corp.,* 685 F.Supp. 769, 777 (D.Kan.1987) (asserting personal jurisdiction over a motorcycle designer on a stream of commerce theory); *Warren v.*

*Honda Motor Co. Ltd.,* 669 F.Supp. 365, 370 (D.Utah 1987) (same). That BAT's product design-related activities were directed at a worldwide, rather than an exclusively New York, market does not defeat jurisdiction. New York smokers were necessarily included in the group of persons envisioned by BAT as ultimate consumers of BAT Group cigarettes. *See Kernan v. Kurz–Hastings,* 175 F.3d 236, 243 (2d Cir.1999) ("exclusive sales rights" agreement contemplating that distributor would sell Japanese manufacturer's machines in North America was "evidence of [the latter's] attempt to serve the New York market, albeit indirectly"); *Warren,* 669 F.Supp. at 370 ("Honda R & D designs for a particular, related manufacturer and known distributors. It therefore deliberately designs the product for a worldwide market that includes the Utah market and other states. Under the circumstances this indirect act to serve Utah" satisfies due process).

### 2. Reasonableness

Those cases in which jurisdiction is so unreasonable as to defeat a showing of "minimum contacts" are rare. *See Burger King,* 471 U.S. at 477, 105 S.Ct. 2174 (defendant must present a "compelling case" of unreasonableness in such cases); *Keeton,* 465 U.S. at 774–75, 104 S.Ct. 1473 (purposeful minimum contacts "ordinarily" sufficient). Generally speaking, this will only occur where "the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994). That is not the case here. Reasonableness considerations militate heavily in favor of the exercise of personal jurisdiction over BAT. First, no appreciable hardship would be suffered by BAT's defending in New York rather than in England. BAT is not some "mom and pop" tobacco shop in the suburbs of Lon-

don, but a multibillion dollar multinational enterprise whose executives regularly travel to New York seeking capital and for other business reasons. It has all the resources and connections necessary for it to adequately defend this suit in New York with relative ease.

New York has a strong interest in providing relief for its injured citizens and in discouraging further harmful conduct from being directed at the state. Its interest in preventing the commission of tortious acts within its borders, whether the injured parties are New Yorkers or residents of other states, is equally pressing. *See, e.g., Keeton,* 465 U.S. at 776–77, 104 S.Ct. 1473 (New Hampshire's deterrent interest extended to libel actions brought by nonresidents). (There is no need to even consider, on the issue of contacts and reasonableness, the fact that in our highly mobile society New Yorkers will be buying and smoking cigarettes in other states and residents of other states will be buying cigarettes and smoking them in New York.).

Lastly, New York has a decided interest in a comprehensive resolution of related claims in a single litigation against this defendant and related defendants. It shares this interest with other states. *See, e.g., id.* at 777, 104 S.Ct. 1473 (forum state's interest in cooperating with other states to provide an efficient forum supported exercise of jurisdiction); *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994) (same). Providing an efficient, unitary forum for the resolution of all smoker personal injury claims will benefit plaintiffs, the interstate judicial system and the defendants by eliminating the need for repetitious litigation around the country and abroad. *See id.*

The interests of all the plaintiffs, whether New Yorkers or non-New Yorkers, in obtaining convenient and effective relief is obvious. New Yorkers and other Americans should not be forced to sue some defendants in the United States and then sue others in England, repeating the same evidence and theories at great expense and inconvenience. Plaintiffs' interest in litigating here is heightened by the fact that certain features of the English legal system, such as the lack of a right to a jury trial, could work to their disadvantage. *See The Legal System of England and Wales in* 3 *Modern Legal Systems Cyclopedia* 3.230.28–29 (Kenneth Robert Redden & Linda L. Schlueter eds., 1994) (personal injury cases heard by judge alone except in special circumstances).

The last factor to be considered, the procedural and substantive policies of other nations whose interests are implicated by the exercise of jurisdiction, does not disfavor a finding of personal jurisdiction in New York. While it is hazardous for an American court to interpret the law of other countries, subjecting BAT, an English corporation, to suit in the United States does not appear to violate any substantive policies of English law. The law of England recognizes product liability causes of action. *See* Peter Kaye, *An Explanatory Guide to the English Law of Torts* at 415–433 (1996) (negligence and strict product liability claims cognizable under English law). The English tort of deceit is similar to American fraud. *See id.* at 504–09.

Whether English procedural policies would be offended by the assertion of jurisdiction over BAT is unclear. For example, it may be that a money judgement in the instant case would be unenforceable in England. Because the United States is not a signatory to the Brussels Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters ("Brussels Convention"), those seeking to enforce judgments rendered by its courts must bring a common law action in contract to collect a debt, claiming the United States judgment as the debt owed. *See generally* 56 Am.Jur. Trials 568–70 (1995); Jeremy Carver & Christopher Napier, *Enforcement of Foreign Judgments in the United Kingdom in Enforcement of For-*

*eign Judgments Worldwide* 223–252 (Charles Platto & William G. Horton eds., 2d ed.1993). Under the applicable common law rules, for a foreign judgment to be enforceable the court that rendered it would have to have had a satisfactory basis for exercising personal jurisdiction over the defendant from the point of view of the English court. This condition will apparently only be met if the defendant was present in the forum at the time the action was instituted, voluntarily appeared in the forum court, or contractually submitted to the forum court's jurisdiction. *See* Gary B. Born, *International Civil Litigation in United States Courts* 943 (3d ed.1996); Carver & Napier, *supra*, at 29. Evidently, an overseas corporation is "present" within a jurisdiction if its business has been carried on there through agents or representatives from a fixed place of business for more than a minimal amount of time. *See* Born, *supra*, 943 n.47 (citing *Adams v. Cape Indus. plc*, [1990] Ch. 433 (Eng. C.A.)). It should be noted that regardless of the enforceability of an American judgment against BAT in an English court, such a judgment might well be enforceable in one of the myriad countries in which BAT owns assets.

England is not the only nation whose policies could be impinged upon by the exercise of personal jurisdiction over BAT in New York. The interests of the European Union are also affected, as are those of the numerous countries where BAT and its subsidiaries operate. Any assertion of jurisdiction over the person of a foreign entity has potential international implications. *See* Andrew L. Strauss, *Beyond National Law: the Neglected Role of the International Law of Personal Jurisdiction in Domestic Courts*, 36 Harv. Int'l L.J. 373 (1995) ("Because the state is the basic unit of political separation into which the global community divides itself, any attempt to proclaim a certain jurisdictional division of responsibilities is necessarily an act impacting on the division of responsibility of all members of the community.").

These global concerns are usefully assessed by considering, to the extent practicable on this motion, how the question of jurisdiction over an American or other foreign corporation alleged to have inflicted large-scale tortious injury in a way similar to BAT might be resolved under international and regional jurisdictional treaties as well as under the jurisdictional law of individual nations. A preliminary survey of the law in this area suggests that, at least in this instance, jurisdiction would not be denied over an American version of BAT.

Negotiation of an international convention on jurisdiction and the enforcement of judgements has been underway since 1993. *See* ALI, International Jurisdiction at 1. While no agreement has been reached, the most recent working draft, provisionally adopted by the Hague Convention's Special Commission on International Jurisdiction and the Effects of Foreign Judgments in Civil and Commercial Matters, reflects an arguable consensus in favor of the exercise of jurisdiction by the courts of a Contracting State on the basis of an injury suffered there. The working draft provides that plaintiffs "may bring an action in tort or delict in the courts of the Contracting State ... in which the injury arose, unless the defendant ... could not reasonably have foreseen that the act or commission could result in an injury of the same nature in that State." Hague Conference on Private International Law, Convention on Jurisdiction and the Effects of Judgments in Civil and Commercial Matters, Work. Doc. No. 241 art. 10 (preliminary draft June, 1999) ("International Jurisdiction Convention"). Where jurisdiction is asserted on the basis of injury arising in a Contracting State, a resulting judgment would be recognized and enforced by other Contracting States. *See* International Jurisdiction Convention art. 26; ALI, International Jurisdiction at 10.

The Brussels Convention, in effect among member states of the European Union, similarly provides for "place of the

injury" jurisdiction. Article 5(3) of the Convention states that "[a] person domiciled in a Contracting State may, in another Contracting State, be sued ... in matters relating to tort, delict or quasi-delict, in the court for the place where the harmful event occurred." See 29 I.L.M. 1413, 1419 (1990). The words "the place where the harmful event occurred has been interpreted to mean "the place where the damage took place or became apparent." *Bier v. Mines de Potasse d'Alsace*, 1976 E.C.R. 1735, 1 C.M.L.R. 284 (1976); *cf.* American Law Institute, *Transnational Rules of Civil Procedure* 2(b)(2) (Discussion Draft April 1, 1999) (providing for jurisdiction, other than in personal injury and wrongful death suits, over a person who "[s]hould participate in the interest of fair and efficient adjudication if ... [t]he person in question is subject to the compulsory judicial authority of the state; and ... [t]he court determines that a decision cannot be effective if that person is not present or that the participation of that person is useful in the interest of justice").

With regard to the jurisdictional law of individual states, a comprehensive review is beyond the scope of this memorandum. A somewhat superficial view of the jurisdictional law of some of our major trading partners will suffice. England's civil procedure rules provide for jurisdiction in connection with tort claims if "the damage was sustained, or resulted from an act committed, within the jurisdiction." Rules of the Supreme Court, Order 11, Rule 1(1)(f). To the extent that this provision would subject an American company to suit in England on the basis of injuries suffered there, reciprocal jurisdiction over BAT would seem to be reasonable.

It appears that neither France nor Japan would deny jurisdiction over an American BAT analogue. *See, e.g.,* C. Civ. art. 14 (providing for jurisdiction over foreigners on the basis of "obligations" contracted in France or abroad with a Frenchman); Henry P. de Vries & Andreas F. Lowenfeld, *Jurisdiction in Personal Actions—A Comparison of Civil Law Views*, 44 Iowa L.Rev. 306, 316–329 (1959) ("obligations" under Article 14 has been interpreted to cover tort actions); *Mukoda v. Boeing*, 604 Hanrei taimuzu 138 (Tokyo Dist. Ct.1983), *translated in* 31 Japanese Ann. Int'l L. 216, 217 (1988) *quoted in* Hideyuki Kobayashi & Yoshimasa Furuta, *Products Liability Act and Transnational Litigation in Japan*, 34 Tex. Int'l L.J. 93, 107 (1999) ("If venue for local territorial competence provided in the Code of Civil Procedure is located in Japan, it would accord with the principles of justice and reason to sustain the jurisdiction of the Japanese court, unless we find some special circumstances. Such special circumstances exist where, in light of the concrete facts of the case concerned, sustaining the Japanese court's jurisdiction would result in contradicting the ideas of promoting impartiality between the parties and fair and prompt administration of justice."); *Okuma v. Boeing Co.,* 1113 Hanrei jiho 26 (Tokyo Dist. Ct. Mar. 27, 1984), *cited in* Kobayashi & Furuta, *supra,* at 107–08 (in plane crash suit against foreign manufacturer without offices or other facilities in Japan, court found that no "extraordinary circumstances" trumped its exercise of "place of the injury" jurisdiction where defendant's wholly-owned subsidiary had a branch office in Japan, the plaintiff resided in Japan and the Japanese Self Defense Airforce Task Team was investigating the crash); *see also* Christopher B. Kuner, *Personal Jurisdiction Based on the Presence of Property in German Law: Past, Present, and Future,* 5 Transnat'l Law. 691 (1992) (discussing asset-based personal jurisdiction under section 23 of the German Code of Civil Procedure).

In sum, all factors bearing on the reasonableness of personal jurisdiction over BAT favor its exercise. The inconsequential burden of defending in New York is more than outweighed by the plaintiffs' and state's keen interest in a New York forum. Insofar as international jurisdictional principles are ascertainable, they do

not appear to negate subjecting BAT to suit in New York on the basis of extensive purposeful acts in New York by co-conspirators and injuries suffered here. There is no persuasive argument of mutuality, of foreign policy, or of comity with other nations suggesting that jurisdiction should be denied in the instant case. Defendant has not met its burden of proving that the exercise of jurisdiction would be unreasonable.

### 3. Mass Torts Due Process Standard

Finally, jurisdiction can be asserted under the mass due process standard explicated in such cases as *In re DES Cases*. *See* Part v.A.3, *infra*. New York's interest in the dispute is intense, and the burden on BAT is minimal compared to the difficulty of the plaintiffs' litigating in England.

### VI. Conclusion

The facts and law provide several bases for exercising personal jurisdiction over the defendant. Any other result would be contrary to developing jurisdictional doctrine in this country and the Federal Rules of Civil Procedure and New York's CPLR. It would substantially increase the burdens on all the other litigants as well as our courts. Considerations of fairness and due process further support denial of defendant BAT's motion to dismiss for lack of personal jurisdiction.

SO ORDERED